753 A.2d 1073

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. JOHN LOYAL, DEFENDANT–APPELLANT.

Argued March 13, 2000—Decided June 27, 2000.

*James K. Smith, Jr.*, Assistant Deputy Public Defender, argued the cause for appellant (*Ivelisse Torres*, Public Defender, attorney).

*Gerard C. Sims, Jr.*, Deputy Attorney General, argued the cause for respondent (*John J. Farmer, Jr.*, Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

STEIN, J.

This appeal requires us to determine whether it is an abuse of discretion for a trial court in a murder trial to declare a mistrial after discovering that defendant's counsel previously represented a significant State witness. We hold that in the context of this prosecution for a drug-related homicide and other offenses defense counsel's recent representation on drug charges of a material, recanting State's witness constituted an appearance of impropriety that justified the trial court's declaration of a mistrial. In the absence of prejudice to the defendant, or bad faith or inexcusable neglect by the prosecutor, we further hold that defendant's retrial on charges of purposeful-or-knowing murder, aggravated assault and weapons offenses was permissible under the federal and state constitutions' prohibitions against double jeopardy.

I

On February 7, 1996, Amedeo Delacruz drove Wanda Colon and Carl Watson to Prince Street in Newark to purchase heroin. Watson had recently ingested methadone to reduce his craving for heroin, but his need continued. Because Watson was violently ill in the car and was apprehensive about the neighborhood, Colon volunteered to purchase heroin for him in an apartment building on Prince Street.

Colon saw Rahnzzan Johnson, Sharonda Posey and John Loyal in the hallway of that building. Colon did not know any of them prior to this encounter. Johnson asked Colon what she wanted and Colon told him that she wanted "a bag of dope." Colon paid ten dollars for the bag of heroin. The transaction took place quickly and Colon left the building without looking in the bag.

Colon returned to the car and Delacruz drove away. After Colon handed the bag to Watson, he opened it and discovered that it was empty. Watson convinced Colon and Delacruz that they should return to the building. Delacruz parked the car near the entrance to the building and Colon and Watson went inside. The same three individuals were present. Colon identified Johnson as

the person who sold her the empty bag of heroin. After a brief argument between Loyal and Watson, Loyal gave Watson another bag that contained heroin. Watson then told Colon to leave the building.

As Colon exited the building, she heard Watson and Johnson talking to each other as they followed her towards the car. Loyal exited the building directly behind the two men. At that point, Johnson ordered Loyal to shoot Watson. Loyal took a gun out of his jacket and shot Watson several times, causing his death. Loyal then pointed the gun in Colon's direction and warned her to leave before he "blew [her] head off." Colon was shocked and immobilized until Johnson pushed her towards the street. Colon returned to the car to find Delacruz terrified and unable to drive. Colon managed to drive the car away from the scene although she was in the passenger seat. When Delacruz began to react, he drove to a nearby police station after Colon told him to do so.

Colon explained what had occurred to a lieutenant at the police station before going to a back room to calm down. After waiting about one-half hour, Detective Ronald Soto of the Newark Police Department interviewed Colon. Soto asked her what had happened and then asked her to look at two photo books to try to identify the shooter. Colon looked through the first book without success. On the first page of the second book, she misidentified a photo of Omar Smalls as the man who sold her the heroin. Soto, based on his street knowledge, knew that Smalls was connected to an individual nicknamed "Tank," whose name was John Loyal. Soto had been actively investigating Loyal on drug-related charges and had two warrants for his arrest. Soto decided to prepare a photographic array for Colon and took a picture of Loyal from the file on his desk relating to the drug investigation.

Colon completed her review of the second book without identifying the shooter. When Colon finished looking through the books, she stood up and walked over to Detective Soto's desk. Colon saw the picture of Loyal on Soto's desk and immediately identified Loyal as the shooter. When Soto asked her if she might be

confused or still in shock, Colon insisted that Loyal was the shooter and said that she was sure.

Following jury selection, defendant's trial for murder and other lesser charges commenced on April 16, 1997. Colon testified that she "can't confuse [Loyal's] face with nobody's face," and stated that she "would never forget that face" when she identified defendant as the shooter. On the following day, Colon finished her testimony and the State then called Sharonda Posey, the other woman present at the scene, as a witness. She testified differently from the description of the incident she had provided in her sworn statement to the police. Posey then testified that her police statement was false. The trial court stopped the proceedings and excused the jury to conduct a *Gross* hearing, see *State v. Gross,* 121 *N.J.* 1, 17, 577 *A.*2d 806 (1990), a procedure designed to determine whether a sworn statement given to the police is reliable and can be introduced substantively into evidence if the witness later recants the statement during his or her testimony.

During the three-day *Gross* hearing, both Johnson and Posey recanted the sworn statements that they gave to the police implicating Loyal as the shooter. Johnson's description of the events leading up to the shooting was similar to the facts recounted in Colon's testimony. Johnson, however, recognized the shooter as an "individual that comes in the neighborhood robbing, sticking up individuals, drug dealers." Johnson testified that he decided to tell the police "what they wanted to hear" to avoid a charge of conspiracy to commit murder because Watson had been killed after purchasing drugs from Johnson. Johnson admitted that everything else in his sworn statement was true except for the identity of the shooter. Detective Manuel Garcia, the officer who took Johnson's statement, refuted Johnson's testimony and testified that he did not threaten Johnson or promise him anything in return for his sworn statement.

Posey testified that she was selling drugs with her boyfriend, Johnson, at the time of the shooting. Posey stated that Johnson and Watson were exiting the building together when someone

came from the side of the building and shot Watson approximately ten times. Posey alleged that the police threatened her with life imprisonment if she did not identify Loyal as the shooter from a photo array. Posey testified that she implicated Loyal as the shooter because she thought she otherwise would go to jail and lose her children. Kirk Schwindel, an employee of the Essex County Prosecutor's Office who was present when Posey made her statement, testified that Posey voluntarily identified Loyal as the shooter and that she was not threatened in any way.

Defense counsel argued that the Johnson and Posey statements were unreliable because they were induced by police officers who threatened potential criminal prosecutions. The State argued that Johnson and Posey testified voluntarily and that the specific testimony about the incident was substantially similar to Colon's, except for the detailed description of the shooting. The court was satisfied that the statements were sufficiently reliable to be admitted into evidence.

After making that ruling, and before the jury returned to the courtroom, the court asked Posey whether she had ever been represented previously by defendant's counsel, William Cucco, who was employed as an attorney for the Essex County Public Defender's office. Posey replied that Cucco never represented her in any prior criminal matter. The prosecutor reminded Posey about her prior guilty plea on January 23, 1995 for possession with intent to distribute a controlled dangerous substance within one thousand feet of school property, and her sentencing hearing on February 14, 1995 for that offense. She replied that she did not think that Cucco was her lawyer and recalled only that she was represented by the Public Defender's office.

The prosecutor had investigated Posey's prior convictions earlier that morning and learned that Cucco previously had represented Posey in his capacity as public defender. Cucco did not remember that representation but acknowledged that, because those events occurred over two years ago, he did not know for certain whether he had represented Posey. While investigating

the Loyal case, Cucco interviewed Posey in prison and did not recognize her. Posey, likewise, did not recognize Cucco.

The trial court considered whether it should disqualify Cucco from representing Loyal. Cucco argued that the prosecutor had provided him with Posey's Judgment of Conviction on the drug charges and that that document did not indicate that Cucco had represented Posey. Cucco also noted that Posey's drug case was unrelated to the Loyal case, had been resolved years ago, and that neither party remembered the prior representation. The court ordered an independent attorney to advise Posey of her rights under *RPC* 1.7, the general rule governing conflicts of interest. Posey continued to insist that she had not been represented previously by Cucco, but agreed to waive any potential conflict of interest. After consulting with Cucco, Loyal also waived any potential conflict of interest that might arise during the cross-examination of Posey.

The prosecutor then requested a mistrial because Cucco had represented Posey in the past. The prosecutor noted that, if convicted, defendant would be able to argue that he received ineffective assistance of counsel because there was a conflict between Cucco's current representation of the defendant and his prior representation of the State's witness. The court pointed out that both sides had waived any potential conflict, but the prosecutor did not believe that the Rules of Professional Conduct permitted the conflict to be waived. The prosecutor also contended that the jury needed to be informed of the prior representation, because it might be germane to the inconsistency between Posey's testimony and her prior sworn statement. Desiring to research the issue independently, the court reserved decision on the motion for a mistrial. The jury then reentered the courtroom, and the prosecutor conducted his direct examination of Posey for the remainder of the morning.

That afternoon the prosecution withdrew its motion for a mistrial, noting that the record indicated that defendant made an intelligent and knowledgeable waiver of any potential conflict and

that Cucco did not possess any confidential information about Posey. However, the court declared a mistrial *sua sponte* over defendant's objection and despite the prosecutor's election not to seek a mistrial. The court determined that *State v. Needham*, 298 *N.J.Super.* 100, 688 *A.2d* 1135 (Law Div.1996), mandated a mistrial, stating that that decision did not permit either party to waive a possible conflict. The court reasoned:

> When an attorney's former client is the State's chief witness, it is beyond dispute that an appearance of impropriety is created requiring the attorney be disqualified. There is an appearance of impropriety.
>
> Even though I don't think Miss Posey could be classified as the—as the State's chief witness, she clearly is a key witness in the fact that she indicates in a statement that the State is seeking to introduce that the defendant is the shooter. She says that. She is a key witness, though not the only key witness.

After discharging the jury, the court restated its reasons for declaring a mistrial:

> First of all, as the Court stated in *Needham*, this Court does not take lightly its decision to disqualify Mr. Cucco, Mr. Loyal's attorney. I do not and will not suggest or imply that Mr. Cucco did anything wrong or will do anything improper or unethical.
>
> However, because of the very strong possibilities of the appearance of impropriety of a recanting eyewitness to a homicide being represented by defense counsel, I am satisfied that I must disqualify Mr. Cucco from continued representation of Mr. Loyal.

Cucco asked that the mistrial be declared with prejudice because Loyal's right to a speedy trial had been compromised. The court informed Cucco of the necessity of filing a motion seeking that relief.

In May 1997, the trial court held a hearing on defendant's motion for dismissal of the indictment based on a double jeopardy violation. The trial court again stated its reason for declaring the mistrial:

> I did not find that Mr. Cucco was in [possession] of some specified, specific information that he learned from his representation of Miss Posey that would, one, lead him to a cross-examination based on information garnered while he was representing Miss Posey. I did not disqualify Mr. Cucco because I felt that because of that representation of Miss Posey, the cross-examination of Miss Posey while representing Mr. Loyal would be less than adequate. Less than vigorous. I specifically disqualified Mr. Cucco because of the appearance of impropriety.

Let's remember what was happening: Miss Posey was on the stand recanting, indicating that this defendant was not the shooter. Her boyfriend had already recanted and clearly, there was a jury question established as to who this jury was going to believe; or, what part of the testimony they were gonna believe. Were they going to believe Miss Colon, who identified Mr. Loyal as the shooter? Were they going to believe Miss Posey? And if so, were they going to believe the sworn statement given? Were they going to believe the testimony that she was about to proffer as to why she gave the sworn statement? That is, that she was forced to.

... I don't sit here in a vacuum. I'm well aware of the family of the deceased sitting in the courtroom. The justice system does not need a not guilty verdict when, in fact, there are grounds that—I mean, yes, I do not know what the jury was going to say. I do not know what the jury was going to believe. But what the State and—does not need, what the court system does not need is a not guilty verdict. Because, perhaps, the family of the victim believes that Mr. Cucco or Mr. Loyal got some special advantage because Mr. Cucco had represented both Mr. Loyal and the recanting witness.

The appearance of impropriety was such that in the interest of justice, once it was determined that the recanting witness was represented by Mr. Cucco, I was satisfied that I must declare a mistrial. So that when a jury makes a determination as to the guilt or innocence of Mr. Loyal, there is not the specter of Mr. Loyal getting an advantage if he's found not guilty because defense attorney also represented an eyewitness.

The only issue that concerned the court at the hearing was whether Cucco was provided a complete copy of Posey's Judgment of Conviction by the prosecutor. The court reserved decision on whether or not there was prosecutorial misconduct that would require defendant's indictment to be dismissed because double jeopardy had attached.

The court subsequently denied defendant's motion for dismissal of the indictment based on double jeopardy. The court again explained the reasons for declaring a mistrial:

I made a determination that the appearance of having a recanting witness now testifying in favor of defendant—in a way favorable to the defendant, who is represented by a defense attorney, gave the appearance that if, in fact, there was a not guilty verdict, I can see something—somebody saying, boy, something smelly there; something is fishy with this thing. She's now recanting. I felt that it was appropriate to declare the mistrial and have a new attorney appointed.

The court relied primarily on *State v. Nappo*, 185 *N.J.Super.* 600, 450 *A.2d* 604 (Law Div.1982), and *State v. Laganella*, 144 *N.J.Super.* 268, 365 *A.2d* 224 (App.Div.), *appeal dismissed*, 74 *N.J.* 256, 377 *A.2d* 652 (1976), in holding that the prosecutor's actions or

inactions did not rise to the level of bad faith or inexcusable neglect, and that the inadvertent failure to notify Cucco that he had previously represented a State's witness did not warrant the extreme sanction of dismissal of the indictment.

Loyal's second trial began in July 1997. Johnson testified that parts of his sworn statement were false and that Loyal did not shoot Watson. Johnson's testimony mirrored the testimony he gave during the *Gross* hearing at Loyal's initial trial. Detective Garcia testified about the investigation and the procedures used to acquire Johnson's voluntary sworn statement. Colon's testimony at the second trial described the incident and implicated Loyal as the shooter. Posey did not testify at defendant's second trial.

The jury convicted defendant of murder, aggravated assault, and related weapons offenses. Prior to being sentenced, defendant renewed his motion for dismissal of the indictment and argued that double jeopardy barred the convictions because prosecutorial misconduct created an opportunity for a mistrial, or alternatively, because there was not a manifest necessity to declare a mistrial based on the potential conflict. The trial court denied the motion and sentenced defendant to life imprisonment with a thirty-year parole ineligibility period on the murder charge, and to concurrent sentences on the remaining charges. The Appellate Division affirmed defendant's convictions and sentence in an unreported opinion. We granted certification. 162 *N.J.* 198, 743 *A.*2d 850 (1999).

## II

### A

Attorneys who practice law in New Jersey are required to comply with strict ethical rules concerning actual or possible conflicts of interests. Bruce A. Green, *Conflicts of Interest in Legal Representation: Should the Appearance of Impropriety Rule Be Elmininated in New Jersey—Or Revived Everywhere*

*Else?,* 28 *Seton Hall L.Rev.* 315, 318–19 (1997). In the case of a former client, attorneys must comply with *RPC* 1.9:

(a) A lawyer who has represented a client in a matter shall not thereafter: (1) represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client consents after a full disclosure of the circumstances and consultation with the former client; or (2) use information relating to the representation to the disadvantage of the former client except as RPC 1.6 would permit with respect to a client or when the information has become generally known.

(b) *The provisions of RPC 1.7(c) are applicable as well to situations covered by this rule.*

[Emphasis added.]

*RPC* 1.7(c) is part of the general rule that prohibits an attorney from representing a client when that representation would create a conflict of interest. *RPC* 1.7 forbids an attorney from representing a client in a situation that would create an appearance of impropriety, even if there were no actual conflict:

(c) This rule shall not alter the effect of case law or ethics opinions to the effect that: (1) in certain cases or categories of cases involving conflicts or apparent conflicts, consent to continued representation is immaterial, and

(2) *in certain cases or situations creating an appearance of impropriety rather than an actual conflict, multiple representation is not permissible, that is, in those situations in which an ordinary knowledgeable citizen acquainted with the facts would conclude that the multiple representation poses substantial risk of disservice to either the public interest or the interest of one of the clients.*

[Emphasis added.]

An appearance of impropriety must be "something more than a fanciful possibility" and "must have some reasonable basis." *In re Opinion No. 653,* 132 *N.J.* 124, 132, 623 *A.2d* 241 (1993) (quoting *Higgins v. Advisory Comm. on Prof'l Ethics,* 73 *N.J.* 123, 129, 373 *A.2d* 372 (1977)). The appearance of impropriety "alone may be sufficient to present an ethical problem even though no actual impropriety exists." *Higgins, supra,* 73 *N.J.* at 129, 373 *A.2d* 372. The doctrine's purpose is "to bolster the public confidence in the integrity of the legal profession." *State v. Catanoso,* 222 *N.J.Super.* 641, 648, 537 *A.2d* 794 (Law Div.1987) (citing *In re Cipriano,* 68 *N.J.* 398, 403, 346 *A.2d* 393 (1975)). Although the doctrine's imprecision has provoked criticism and requests for its

rescission as applied to private civil litigation, see *Report of the Professional Responsibility Rules Committee,* 158 *N.J.L.J.* 472 (1999), the doctrine's relevance in criminal matters and to issues of public-entity representation remains unchallenged. This Court recently declined to implement a recommendation to eliminate the appearance of impropriety standard from the Rules of Professional Conduct. See *Notice to the Bar,* 159 *N.J.L.J.* 843 (2000).

In determining whether there is a reasonable basis for finding an appearance of impropriety, we must view the conduct as would an "ordinary knowledgeable citizen acquainted with the facts." *Dewey v. R.J. Reynolds Tobacco Co.,* 109 *N.J.* 201, 216, 536 *A.*2d 243 (1988)(quoting *RPC* 1.7(c)(2)). That inquiry is highly fact-sensitive; it does not occur in a vacuum. *In re Opinion No. 415,* 81 *N.J.* 318, 325, 407 *A.*2d 1197 (1979). Where there exists an appearance of impropriety in an attorney's representation of a client, that representation generally must cease. *In re Petition for Review of Opinion No. 569,* 103 *N.J.* 325, 334–35, 511 *A.*2d 119 (1986); *Ross v. Canino,* 93 *N.J.* 402, 409–10, 461 *A.*2d 585 (1983); *Opinion No. 415, supra,* 81 *N.J.* at 325, 407 *A.*2d 1197. Once an appearance of impropriety is found, "only in extraordinary cases should a client's right to counsel of his or her choice outweigh the need to maintain the highest standards of the profession." *Dewey, supra,* 109 *N.J.* at 220, 536 *A.*2d 243.

When an appearance of impropriety is found in a criminal matter, disqualification of an attorney routinely is required. In *State v. Morelli,* 152 *N.J.Super.* 67, 74, 377 *A.*2d 774 (App.Div. 1977), defendant's counsel was disqualified because his firm represented an important prosecution witness and employed an attorney who had worked in the prosecutor's office while the defendant was being investigated. The Appellate Division, citing caselaw as well as opinions of the Advisory Committee on Professional Ethics, concluded that a defense attorney must be disqualified when there is a "risk of the unacceptable appearance of possible impropriety." *Id.* at 72, 377 *A.*2d 774 (citing *State v. Lucarello,* 135 *N.J.Super.* 347, 343 *A.*2d 465 (App.Div.), *aff'd o.b.,* 69 *N.J.* 31, 350

A.2d 226 (1975); *State v. Jaquindo*, 138 *N.J.Super.* 62, 350 *A.2d* 252 (App.Div.), *aff'd sub nom., State v. Rizzo*, 69 *N.J.* 28, 350 *A.2d* 225 (1975); *In re Opinion 361*, 100 *N.J.L.J.* 1 (1977); *In re Opinion 340*, 99 *N.J.L.J.* 610 (1976); *In re Opinion 276*, 96 *N.J.L.J.* 1461 (1973); *In re Opinion 207*, 94 *N.J.L.J.* 451 (1971)). Defendant's waiver of his right to appeal a possible conviction based on a claim of ineffective assistance of counsel was found to be irrelevant. *Morelli, supra,* 152 *N.J.Super.* at 74, 377 *A.2d* 774.

In *In re Garber,* 95 *N.J.* 597, 598, 472 *A.2d* 566 (1984), this Court suspended an attorney from the practice of law for one year because he represented a murder witness who recanted a positive identification of the defendant, an individual whom the attorney had represented earlier in matters unrelated to the murder indictment. *Id.* at 605, 472 *A.2d* 566. The Court held that a "recanting witness is confronted by enormous legal pitfalls and thus is particularly in need of careful, objective and sound legal advice." *Ibid.* The Court found that the attorney's "intertwined connections" with both parties "presented an indelible appearance of impropriety that breaches ethical standards." *Id.* at 610, 472 *A.2d* 566. The Court also was concerned with "the attendant public perception that, as a consequence of respondent's compromised position, professional probity has been diluted and the administration of justice perverted." *Id.* at 611, 472 *A.2d* 566. *See also In re Cohn,* 46 *N.J.* 202, 213, 216 *A.2d* 1 (1966) (noting that public knowledge of attorney's dual representation of defendant and witness testifying against that defendant "would engender, at the least, a serious doubt about the integrity of the proceeding."). The *Garber* Court found that the witness's consent was immaterial and ineffective because "[t]here are certain conflicts that are so egregious that they cannot be cured by consent." *Id.* at 613–14, 472 *A.2d* 566.

Likewise, in *Catanoso, supra,* the Law Division found that if the defendant's counsel acted as a zealous advocate, he would have had to "breach the duty of loyalty that he owes to his former client," the State's main witness against the defendant. 222

*N.J.Super.* at 648, 537 *A.*2d 794. Therefore, although the defendant was willing to waive the right to cross-examine the State's witness so that he could maintain his choice of counsel, the Law Division observed that the defendant's counsel's prior representation of the witness may have permitted him to acquire confidential information that could be used favorably by the defendant. *Id.* at 645, 537 *A.*2d 794. *See also Reardon v. Marlayne, Inc.*, 83 *N.J.* 460, 473, 416 *A.*2d 852 (1980) (holding that presumption of access to and knowledge of confidential information between attorney and former client, notwithstanding attorney's declarations to the contrary, may not be rebutted). The Law Division found that defendant's counsel created a "high risk of impropriety" when the State's witness "stands to be discredited, on cross-examination, by his former attorney." *Catanoso, supra,* 222 *N.J.Super.* at 648, 537 *A.*2d 794. The court concluded that "[i]f there is an 'adequate factual basis' for an informed citizen to conclude that there would be a 'high risk' of impropriety if [the] defendant's lawyer continued to represent his client, then the lawyer must be disqualified." *Ibid.* (citing *In re Opinion No. 569, supra,* 103 *N.J.* at 331, 511 *A.*2d 119). *See also Reardon, supra,* 83 *N.J.* at 471, 416 *A.*2d 852 (stating that "[i]f there be any doubt as to the propriety of an attorney's representation of a client, such doubt must be resolved in favor of disqualification.").

In *Needham, supra,* a case relied on by the trial court in the matter before us, the issue was "whether a defense attorney must be disqualified upon motion by the State when that attorney represented one of the chief prosecution witnesses in an entirely unrelated matter." 298 *N.J.Super.* at 102, 688 *A.*2d 1135. The defendant was charged with multiple offenses and Officer Warner was expected to testify against the defendant. *Ibid.* The defendant's counsel had represented Warner in an indictable criminal matter seven years earlier and, more recently, in an internal affairs investigation that did not culminate in formal charges. *Id.* at 102–03, 688 *A.*2d 1135. The Law Division held that that prior representation created an appearance of impropriety and warranted the disqualification of the defendant's counsel because "[w]hen

an attorney's former client is the State's chief witness, it is beyond dispute that an appearance of impropriety is created." *Id.* at 103, 688 *A.*2d 1135.

The *Needham* court found that "[i]f the defendant is acquitted as a result of the trial, an inference of wrongdoing is created by the perception that the acquittal was the result of the relationship or influence between [the defendant's counsel] and Officer Warner." *Id.* at 105, 688 *A.*2d 1135. The court also was concerned that Warner could provide strategic information to assist his former attorney, that the defendant's counsel might not cross-examine his former client vigorously, or that the defendant's attorney might use confidential information from the prior attorney-client relationship to cross-examine his former client. *Id.* at 105–06, 688 *A.*2d 1135. The court concluded that an adequate factual basis existed for an informed citizen to perceive an appearance of impropriety and that the defendant's attempt to waive the appearance of impropriety did not cure the disqualification of his attorney. *Id.* at 107, 688 *A.*2d 1135. The court did not "intend to suggest or imply that [the defendant's counsel] has done, or will do, anything improper or unethical" but "because the possibilities of impropriety are so strong and because there is a risk that [the] defendant will not be adequately represented," the court disqualified the defendant's attorney. *Ibid.*

That defendant was prepared to waive any potential conflict of interest resulting from his counsel's prior representation of Posey does not absolve the trial court of the responsibility for assuring the fairness and reliability of the trial. In *Wheat v. United States,* 486 *U.S.* 153, 108 *S.Ct.* 1692, 100 *L.Ed.*2d 140 (1988), the defendant in a drug conspiracy prosecution requested that the attorney for two of his co-defendants represent him in place of his original counsel, informing the court of that request two days before trial. The prosecution objected because of the potential for conflict between counsel's obligations to the co-defendants and his proposed responsibility as defendant's trial counsel. Defendant and the co-defendants agreed to waive any conflict, and defendant

emphasized his right to select his own counsel. The district court denied the requested substitution because of counsel's conflict of interest. Defendant was tried and convicted, represented by his original counsel. The Ninth Circuit Court of Appeals affirmed the conviction. *U.S. v. Wheat,* 813 *F.*2d 1399 (1987). The United States Supreme Court affirmed, rejecting defendant's contention that the waivers by the defendant and co-defendants adequately addressed the conflict issue:

> Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.... Not only the interest of a criminal defendant but the institutional interest in the rendition of just verdicts in criminal cases may be jeopardized by unregulated multiple representation.
>
> ....
>
> Nor does a waiver by the defendant necessarily solve the problem, for we note, without passing judgment on, the apparent willingness of Courts of Appeals to entertain ineffective-assistance claims from defendants who have specifically waived the right to conflict-free counsel.
>
> ....
>
> For these reasons we think the district court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses.
>
> [*Id.* at 160–63, 108 *S.Ct.* at 1698–99, 100 *L.Ed.*2d at 149–51.]

To the same effect is *United States ex. rel. Stewart v. Kelly,* 870 *F.*2d 854 (2d Cir.1989). There, the Court of Appeals reversed the district court's grant of a *habeas corpus* petition and sustained the trial court's refusal to permit defendant to be represented by his preferred counsel because of that counsel's prior representation of a prosecution witness. Rejecting defendant's contention that his waiver of counsel's conflict should be controlling, the Court of Appeals observed:

> There is a presumption in favor of a defendant's choice of counsel, but this may be overcome "by a showing of a serious potential for conflict." ... In balancing what can be competing interests of the Sixth Amendment, the trial court has "an independent duty to ensure that criminal defendants receive a trial that is fair." *Id.* at 856 (quoting *Wheat, supra,* 486 U.S. at 161, 164, 108 *S.Ct.* at 1697, 1699, 100 *L.Ed.*2d at 150, 152).

## B

■■■ Individuals are constitutionally protected against being tried twice for the same offense. The United States Constitution states: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb." *U.S. Const.* amend. V. Likewise, New Jersey's Constitution provides: "No person shall, after acquittal, be tried for the same offense." *N.J. Const.* art. I, ¶ 11. Additionally, *N.J.S.A.* 2C:1–9 states:

> A prosecution of a defendant for a violation of the same provision of the statutes based upon the same facts as a former prosecution is barred by such former prosecution under the following circumstances:
>
> . . .
>
> d. The former prosecution was improperly terminated. Except as provided in this subsection, there is an improper termination of a prosecution if the termination is for reasons not amounting to an acquittal, and it takes place after the jury was impaneled and sworn. . . . Termination under any of the following circumstances is not improper:
>
> . . .
>
> (3) The trial court finds that the termination is required by a sufficient legal reason and a manifest or absolute or overriding necessity.

Termination of a trial after jeopardy attaches does not automatically bar subsequent re-prosecution. *State v. Lynch,* 79 *N.J.* 327, 342, 399 *A.*2d 629 (1979). Only improper termination of proceedings by a trial court bars a retrial. *State v. Gallegan,* 117 *N.J.* 345, 353, 567 *A.*2d 204 (1989); *State v. Dunns,* 266 *N.J.Super.* 349, 363, 629 *A.*2d 922 (App.Div.), *certif. denied,* 134 *N.J.* 567, 636 *A.*2d 524 (1993); *State in the Interest of D.P.,* 232 *N.J.Super.* 8, 13, 556 *A.*2d 335 (App.Div.1989). Where the court finds a sufficient legal reason and manifest necessity to terminate a trial, the defendant's right to have his initial trial completed is subordinated to the public's interest in fair trials and reliable judgments. *Wade v. Hunter,* 336 *U.S.* 684, 689, 69 *S.Ct.* 834, 837, 93 *L.Ed.* 974, 978 (1949).

■■■ Whether "manifest necessity" or "the ends of public justice" require declaration of a mistrial depends on the unique facts of the case and the sound discretion of the trial court. That test was first articulated in *United States v. Perez,* 22 *U.S.* (9 *Wheat.*)

579, 580, 6 *L.Ed.* 165, 165 (1824), where the Supreme Court observed that

> the law has invested courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes.

That standard has guided judges in making the discretionary decision whether particular trial conditions warrant a *sua sponte* mistrial declaration. *Arizona v. Washington*, 434 *U.S.* 497, 505–06, 98 *S.Ct.* 824, 830, 54 *L.Ed.*2d 717, 728 (1978); *United States v. Jorn*, 400 *U.S.* 470, 481, 91 *S.Ct.* 547, 555, 27 *L.Ed.*2d 543, 554 (1971); *Gori v. United States*, 367 *U.S.* 364, 367–68, 81 *S.Ct.* 1523, 1526, 6 *L.Ed.*2d 901, 904–05 (1961); *State v. Rechtschaffer*, 70 *N.J.* 395, 405, 360 *A.*2d 362 (1976); *State v. Farmer*, 48 *N.J.* 145, 170, 224 *A.*2d 481 (1966), *cert. denied*, 386 *U.S.* 991, 87 *S.Ct.* 1305, 18 *L.Ed.*2d 335 (1967).

 Under the standard enunciated in *Perez*, *supra*, a trial court has wide discretion in granting a mistrial. See, *e.g.*, *Illinois v. Somerville*, 410 *U.S.* 458, 462, 93 *S.Ct.* 1066, 1069, 35 *L.Ed.*2d 425, 429 (1973); *Gori*, *supra*, 367 *U.S.* at 368, 81 *S.Ct.* at 1526, 6 *L.Ed.*2d at 904; *Farmer*, *supra*, 48 *N.J.* at 171, 224 *A.*2d 481. Where a trial court declares a mistrial because of a substantial concern that the trial's result may be tainted, "the trial judge's determination is entitled to special respect." *Arizona v. Washington*, *supra*, 434 *U.S.* at 510, 98 *S.Ct.* at 833, 54 *L.Ed.*2d at 731. "Where ... the trial court acts *sua sponte*, over the objections of both parties, propriety of the mistrial depends upon the sound exercise of the court's discretion." *Rechtschaffer*, *supra*, 70 *N.J.* at 406, 360 *A.*2d 362. In *Rechtschaffer*, we discussed substantial United States Supreme Court precedent that established pertinent standards to determine whether declaration of a mistrial was proper:

> The common threads that run through the Supreme Court cases are centered about the propriety of the trial court's granting *sua sponte* the mistrial and its

cause. Did the trial court properly exercise its discretion so that a mistrial was justified? Did it have a viable alternative? If justified, what circumstances created the situation? Was it due to prosecutorial or defense misconduct? Will a second trial accord with the ends of public justice and with proper judicial administration? Will the defendant be prejudiced by a second trial, and if so, to what extent?

[*Id.* at 410–11, 360 *A.2d* 362. (citation omitted).]

In that case, we concluded that neither manifest necessity nor the ends of public justice warranted the grant of the partial mistrial because the mistrial was not justified and the defendant was prejudiced by the mistrial declaration. *Id.* at 415, 360 *A.2d* 362.

In *Arizona v. Washington, supra,* the Supreme Court examined whether a mistrial was a manifest necessity where defendant's counsel made an improper and prejudicial comment during his opening statement. 434 *U.S.* at 498, 98 *S.Ct.* at 826, 54 *L.Ed.2d* at 723. The federal District Court had concluded that the trial court did not adequately consider alternatives to a mistrial and did not make a finding of manifest necessity; the Court of Appeals for the Ninth Circuit affirmed. *Id.* at 501–02, 98 *S.Ct.* at 828, 54 *L.Ed.2d* at 725–26. The Supreme Court reversed the Ninth Circuit and concluded that the trial court exercised sound discretion when it declared a mistrial because it was concerned about the possibility of a double jeopardy violation, and that the trial court did not act precipitously in response to the prosecutor's request for a mistrial. *Id.* at 514–15, 98 *S.Ct.* at 835, 54 *L.Ed.2d* at 733–34. Similarly in *Illinois v. Somerville, supra,* the Supreme Court held that if a mistrial vindicates a significant state policy and "aborts a proceeding that at best would have produced a verdict that could be upset by one of the parties," a defendant's interest may be outweighed by the "equally legitimate demand for public justice." 410 *U.S.* at 471, 93 *S.Ct.* at 1074, 35 *L.Ed.2d* at 435.

New Jersey's double jeopardy jurisprudence is coextensive with federal law. *Lynch, supra,* 79 *N.J.* at 340, 399 *A.2d* 629; *Rechtschaffer, supra,* 70 *N.J.* at 404, 360 *A.2d* 362; *Farmer, supra,* 48 *N.J.* at 168, 224 *A.2d* 481. In *Farmer, supra,* the defendant's first trial for murder ended when the trial court declared a mistrial *sua sponte* over the objections of both the State and

defendant. 48 *N.J.* at 167, 224 *A.*2d 481. The mistrial was declared on the first day of trial at which evidence was presented to the jury, because the prosecutor committed a good faith violation of a discovery order. *Id.* at 173, 224 *A.*2d 481. On appeal, we noted that

[a] wide range of discretion is recognized in the trial judge, who has his finger on the pulse of the proceedings. If in his judgment emergent conditions come into being which persuade him that the ends of justice for the defendant and the State cannot be achieved without aborting the trial, neither the Federal nor the State Constitution proscribes such an order. This is particularly true where the circumstances which to him compel the order do not bespeak bad faith or oppressive conduct by the prosecution or a desire or effort to improve the chances of conviction at a subsequent trial.

[*Id.* at 171, 224 *A.*2d 481.]

We balanced the defendant's and the State's interests in determining whether the defense of double jeopardy barred the retrial of defendant for murder:

If some unexpected, untoward and undesigned incident or circumstance arises which does not bespeak bad faith, inexcusable neglect or inadvertence or oppressive conduct on the part of the State, but which in the considered judgment of the trial court creates an urgent need to discontinue the trial in order to safeguard the defendant against real or apparent prejudice stemming therefrom, the Federal and State Constitutions do not stand in the way of declaration of a mistrial.... Moreover, if an incident or circumstance of that nature moves the court to order a mistrial not only to safeguard the right of the defendant to a full and fair trial, but also to protect the right of society to have its trial processes applied fully and fairly in the due administration of the criminal law, there is even less basis for a claim of trespass upon the privilege against double jeopardy. Clearly the societal right to have the accused tried and punished if found guilty stands side by side with the right of the accused to be prosecuted fairly and not oppressively.

[*Id.* at 174–75, 224 *A.*2d 481 (citations omitted).]

We noted that "there is no over-all formula, no hard and fast rule for determining when an order of mistrial will cause the jeopardy bar to spring into being, [and that] each case must depend upon its own facts and the urgency of its circumstances." *Id.* at 177, 224 *A.*2d 481. After a careful review of the record, we concluded that the trial court's

reluctant declaration of a mistrial constituted a reasonable exercise of judicial discretion, and that it represented the most sensible balancing of the interests of the defendant and the public. We have no doubt it came from a conscience acutely

aware not only of the sacredness of the life at stake before him, but also of the sacredness of the life that was taken.

[*Id.* at 174, 224 *A.*2d 481.]

In this case, the trial court relied on *Laganella* when it denied defendant's motion for dismissal of the indictment prior to defendant's second trial. In *Laganella, supra,* the defendant's motion for a mistrial was granted by the trial court. 144 *N.J.Super.* at 277, 365 *A.*2d 224. The Appellate Division found that "the dismissal of the indictment below was a mistaken exercise of discretion." *Id.* at 283, 365 *A.*2d 224. In remanding the case for a new trial, the Appellate Division held "that important interests other than those of defendant alone are involved in the trial of criminal cases." *Id.* at 287, 365 *A.*2d 224. The Appellate Division rejected following a "hard and fast rule" or "ritualistic formula" and noted that "mere empanelment of a jury and commencement of a case does not automatically provide a criminal defendant with a bar to further prosecution." *Id.* at 286–87, 365 *A.*2d 224. Because the trial court and the State had acted in good faith, and the defendant would not be subjected to significant annoyance, harassment or expense, the judgment of dismissal was reversed. *Id.* at 288–90, 365 *A.*2d 224. The Appellate Division concluded that

[t]o apply the bar of double jeopardy in the instant matter, absent compelling considerations of fairness to [the] defendant or for the purpose of protection against governmental action found by us not to be arbitrary, would disserve [the public interest], for there still has been no trial on the merits.

[*Id.* at 290, 365 *A.*2d 224.]

### III

Against this jurisprudential backdrop we must determine whether defense counsel's prior representation of Sharonda Posey created an appearance of impropriety and whether the trial court properly declared a mistrial. In considering whether a lawyer's responsibility to a client is compromised by his representation of a former client and constitutes an appearance of impropriety, we address the issue from the perspective of "a reasonable and informed citizen." *Opinion No. 653, supra,* 132 *N.J.* at 132, 623 *A.*2d 241. We also consider whether the representation posed a

"substantial risk of disservice either to the public interest or the interest of one of the clients." *Dewey, supra,* 109 *N.J.* at 216, 536 *A.*2d 243 (quoting *RPC* 1.7(c)(2)).

██ The trial court correctly found that Cucco's representation of defendant created an unacceptable appearance of impropriety. The trial court reasoned that Cucco may have obtained confidential information during his prior representation of Posey that he could now use to impeach her credibility on cross-examination. We note that Posey's prior conviction was drug-related and that defendant Loyal was charged with a murder that occurred during a drug transaction. Additionally, because of their prior relationship, the trial court may have been concerned that Cucco would cross-examine Posey less vigorously at the expense of defendant's interests. Moreover, Posey's decision to recant her statement implicating defendant enhanced the trial court's concerns. The prosecutor had contended that the jury would have to be notified of Cucco's prior representation of Posey in order to assess the proper weight to be given to both Posey's testimony and her statement to police. Both Posey's interest and defendant's interest may have been disserved by counsel's prior relationship with Posey.

Additionally, the public interest would have been disserved by Cucco's continued representation of defendant. The trial court noted that an independent observer might believe that "something is fishy" when a witness who was previously represented by defendant's counsel recants a prior statement that identified defendant as the shooter. As we stated in *Garber:*

> The public itself has the greatest stake in the propriety of the legal relationships that are created to properly administer criminal justice.... Clearly, the public interest in the administration of criminal justice in the circumstances of this case compelled the unbiased and unstinted representation of [the witness].
>
> [*Garber, supra,* 95 *N.J.* at 614, 472 *A.*2d 566 (quotation omitted).]

In the context of this prosecution for a drug-related murder and other offenses, we are convinced that an appearance of impropriety existed where defendant's counsel previously had represented on drug charges a material recanting State's witness. Cucco's and

Posey's failure to recall that prior representation or to recognize each other prior to trial is of no consequence.

■ Under those circumstances, we are persuaded that there was manifest necessity to declare a mistrial, considering the "ends of justice for the defendant and the State." *Farmer, supra,* 48 *N.J.* at 171, 224 *A.*2d 481. In our view, the trial court exercised sound discretion in declaring a mistrial and that decision is entitled to deference. *Ibid.* (noting that "appellate courts must realize that under our system the conduct of a trial is committed to the trial judge, and that in appraising the exercise of his discretionary action a wise and tolerant restraint must be practiced if the separate levels of the judicial process are to be maintained."). *See also Arizona v. Washington, supra,* 434 *U.S.* at 515–16, 98 *S.Ct.* at 835–36, 54 *L.Ed.*2d at 734 (holding that trial court's responsible and deliberate actions supported mistrial declaration); *State v. Modell,* 260 *N.J.Super.* 227, 239, 615 *A.*2d 1264 (1992)(recognizing "that the trial judge must be given a wide range of discretion in determining whether a mistrial should be declared.").

Our dissenting colleague disagrees, expressing the view that a trial court cannot "unilaterally discontinue a criminal trial to vindicate [the appearance of impropriety rule], without regard for the Double Jeopardy Clause." *Post* at 458, 753 *A.*2d at 1096. That observation misperceives the interest vindicated by the trial court's declaration of a mistrial. As the United States Supreme Court observed in *Wheat, supra,* 486 *U.S.* at 160, 108 *S.Ct.* at 1698, 100 *L.Ed.*2d at 149–50 (1988):

> Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.... Not only the interest of a criminal defendant but the institutional interest in the rendition of just verdicts in criminal cases may be jeopardized by unregulated multiple representation.

Other courts have recognized the necessity for declaring a mistrial to preclude a lawyer's actual or potential conflict of interest from tainting the fairness of a criminal trial. In *In re Hoang,* 245 *Kan.* 560, 781 *P.*2d 731 (1989), the Kansas Supreme

Court upheld the declaration of a mistrial by a trial court "confronted with facts indicating that defense counsel in a criminal case may have a conflict of interest due to prior representation of a prosecution witness." *Id.* at 732. Observing that the trial court "had a duty 'to maintain the integrity of the administration of the justice system,'" *id.* at 733, the court rejected defendant's double jeopardy challenge on the basis that the mistrial declaration satisfied the "manifest necessity" standard. *Id.* at 738.

Similarly, in *Commonwealth v. Diehl,* 532 *Pa.* 214, 615 *A.*2d 690 (1992), the Pennsylvania Supreme Court upheld a trial court's mistrial declaration after the trial court learned that the district attorney had previously represented the defendant in a custody proceeding. The trial court was concerned after "the jury learned that the person who was seeking [defendant's] conviction was the same person who . . . had advised him with regard to [a] visitation order." *Id.* at 692. Rejecting defendant's contention that principles of double jeopardy precluded a retrial, the Pennsylvania Supreme Court observed that

the ends of public justice would have otherwise been defeated without the trial court's *sua sponte* declaration of a mistrial. The trial court was insuring that Appellant would receive a trial by a fair and impartial jury which would return a verdict based solely on evidence adduced at trial. This is an interest which is to be protected not only for defendants, but also for the public, which has a compelling interest in justice for all.

[*Ibid.*]

In *United States v. Simonetti,* 998 *F.*2d 39 (1st Cir.1993), the Court of Appeals rejected defendant's double jeopardy challenge to his retrial on drug distribution charges and concluded that his counsel's conflict of interest that precluded his effective representation of defendant without a waiver from another client potentially implicated in the drug offenses justified the trial court's grant of a mistrial over defendant's objection. Finding that "manifest necessity" required the grant of a mistrial, the Court of Appeals observed that the "manifest necessity" standard protects not only a defendant's interests but also "'the public's interest in fair trials designed to end in just judgments.'" *Id.* at 41 (quoting *Oregon v. Kennedy,* 456 *U.S.* 667, 672, 102 *S.Ct.* 2083, 2087, 72 *L.Ed.*2d 416

(1982)) (quoting *Wade v. Hunter, supra,* 336 *U.S.* at 689, 69 *S.Ct.* at 837, 93 *L.Ed.* at 978 (1949)). *See also People v. McNally,* 107 *Cal.App.*3d 387, 165 *Cal.Rptr.* 715, 718–19 (1980) (rejecting defendant's double jeopardy challenge and upholding trial court's mistrial declaration over defendant's objection because of counsel's disabling conflict of interest).

██ Those precedents demonstrate that the primary basis for the trial court's declaration of a mistrial in this matter was the vindication of the public interest in a fair trial. Contrary to our dissenting colleague's view, *post* at 459–60, 753 *A.2d* at 1097, the mistrial was not mandated because counsel may have violated the appearance of impropriety standards. An ethical violation in a criminal trial ordinarily will not require a declaration of a mistrial. *State v. Feaster,* 156 *N.J.* 1, 85–87, 716 *A.2d* 395 (1998). As the cited cases demonstrate, however, in some circumstances a lawyer's conflict of interest may jeopardize not only the defendant's right to effective representation, but also "the institutional interest in the rendition of just verdicts in criminal cases," *Wheat, supra,* 486 *U.S.* at 160, 108 *S.Ct.* at 1698, 100 *L.Ed.*2d at 149.

We are fully persuaded that the trial court correctly concluded that defense counsel's prior representation of a material recanting witness posed a significant risk to the reliability of the outcome of defendant's trial. Additionally, the trial court found no evidence of misconduct, bad faith or inexcusable neglect on the part of the State. Defendant does not appear to have been prejudiced by the delay in the criminal proceedings. Based on the interests of the parties and the public in the proper administration of the criminal justice system, the trial court acted appropriately and within its wide range of discretion in declaring a mistrial over the objection of both the prosecution and defense counsel.

IV

The judgment of the Appellate Division is affirmed.

COLEMAN, J., dissenting.

The narrow issue in this case is whether a public defender's prior representation of a State witness created a manifest necessity for the trial court to declare a mistrial, over the objection of defendant, the State, and the witness. The trial court determined that the prior representation created an impermissible appearance of impropriety and declared a mistrial. In a second trial, a jury convicted defendant of murder. The Appellate Division concluded that the prior representation created an appearance of impropriety and held that the mistrial was a manifest necessity. A majority of this Court agrees.

Because of the high priority accorded to a defendant to have his or her fate in a criminal case determined by the jury first impaneled and sworn, and because neither unavoidable necessity nor the ends of public justice compelled the trial court *sua sponte* to declare a mistrial, I cannot join the Court's erroneous conclusion that double jeopardy principles did not preclude a second trial. New Jersey is the only state that still clings to a vague appearance of impropriety ethics rule. Ironically, the majority has elevated the status of such a questionable rule, one that the Court's own committee has recommended be abolished, to the point that it trumps the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution. No case in this or any other jurisdiction has reached such a draconian result. Consequently, I must dissent.

I.

On February 7, 1996, Carl Watson, Wanda Colon, and Amedeo Delacruz drove to an apartment building in Newark to purchase heroin. Colon entered the building, where she encountered Rahnzzan Johnson, Sharonda Posey, and a third individual, allegedly nicknamed "Tank." Colon requested ten dollars of "dope"

and Johnson handed her a bag. As the purchasers drove away, they discovered the bag was empty. Undeterred, they returned to the scene of the fraudulent transaction, although this time Watson accompanied Colon into the building. Once inside, Watson argued with Johnson and Posey, accusing them of selling Colon an empty bag. Watson eventually received a new bag, and Colon left the building. Watson and Johnson followed, still arguing. Colon then heard Johnson say, "Tank, shoot this motherfucker, shoot him." Tank did, shooting Watson eleven times. Johnson pushed Colon towards the car, threatening to shoot her. Both Colon and Delacruz were in shock from having seen their friend murdered; yet, they managed to drive to a police station to report the incident.

At the police station, Colon informed a detective that the shooter's name was "Tank" or "Tink" and she agreed to look through two books of photos in an attempt to identify him. The search proved to be fruitless, although Colon did identify one photograph as the individual who sold her the drugs. That photograph was of an Omar Smalls. The detective knew that Smalls associated with defendant John Loyal, who went by the nickname "Tank," and whom the detective had been investigating. The detective retrieved defendant's file, and Colon immediately identified defendant as the shooter. Subsequently, the police learned that Smalls, at the time of the incident, was serving a prison sentence and thus could not have been the individual who sold Colon the drugs.

Defendant was charged with murder and possession of a handgun, and trial commenced on April 16, 1997. Colon testified to the above version of events. Posey testified that while she and Johnson were at the scene during the drug transaction, defendant was not present, and thus did not shoot Watson. According to Posey, after Johnson and Watson existed the building a third individual shot Watson.

Posey's testimony differed substantially from a statement she gave to the police a few weeks after the incident. Both she and

Johnson signed type-written statements identifying defendant as the shooter. Confronted with recanting witnesses, the trial court held a hearing required by *State v. Gross,* 121 *N.J.* 1, 17, 577 *A.*2d 806 (1990), to determine the reliability of Johnson's and Posey's out-of-court, inconsistent statements.

At that hearing, Johnson testified that on the day in question only he and Posey were selling drugs out of the Newark apartment building. After Colon returned to the building with Watson, and they all left the building, a third individual appeared and shot Watson. Johnson identified the shooter as Rasheed Philson, "an individual that comes in the neighborhood robbing, sticking up individuals, drug dealers." He originally identified Philson as the shooter, but he maintained that he signed the statement identifying defendant as the shooter after the police threatened to charge him with conspiracy. Posey provided comparable testimony, noting that the police became unhappy when she refused to identify defendant as the shooter. According to Posey, the detective "got really angry because I guess I wasn't saying what he wanted to hear and he started threatening me with life in prison because I was on parole.... And he kept throwing up pictures and then every picture, the defendant face was in every picture." Posey agreed to take a polygraph test, which the police told her she failed. Posey asserted that she then agreed to make the statement implicating defendant.

Detective Manuel Garcia and Investigator Kirk Schwindel, the officers who took the statements from Posey and Johnson, testified that both witnesses made and signed their statements voluntarily, that neither interrogator suggested that defendant was the shooter, and that the witnesses were not put under any duress. Schwindel noted that Posey originally identified someone else as the shooter, although he believed that it was a fictitious person. Schwindel testified that after Posey took the polygraph test she "broke down. She was crying. She said ah, you don't realize what's happening. I live out there. I'm gonna be killed." At that

point, according to Schwindel, Posey identified defendant as the shooter.

After weighing the relevant factors, the trial court determined that both witnesses' out-of-court statements "were given in reliable circumstances" and could be admitted into evidence under *N.J.R.E.* 803a. However, before continuing the trial, the court ordered Posey to return to the stand. Apparently, the State discovered a presentence report establishing that defendant's attorney, William Cucco, had represented Posey in 1995 in an unrelated criminal matter. The judge asked Posey whether this was true and Posey responded that while she did plead guilty and was sentenced in a criminal matter in 1995, she did not think Cucco was the public defender who represented her. Posey observed that she has a cousin with a similar name, Shamese Posey, who Cucco once represented, and that might be the source of the confusion. In fact, a few years earlier, Cucco mistakenly summoned Sharonda Posey from prison to interview her, thinking she was Shamese.

The court then questioned Cucco, who responded that he did not recall representing Posey. Cucco noted that he "stumbled across this Miss Posey" during his representation of her cousin, but "I don't believe I represented her." Cucco also remarked that the Judgement of Conviction provided to him by the State concerning Posey, a two-sided document, was only photocopied on one side. So if information relating to his past representation was on the back, he "was not alerted to it."

The State moved to disqualify Cucco based on a conflict of interest. The trial court observed that "the difficulty I have is that this is a State's witness and if, in fact, the CCH's, or Judgments of Conviction had been pulled, it probably wouldn't have gotten this far." The court assigned Posey a pool attorney, and instructed Cucco to consult with defendant on the issue of a potential conflict of interest. After conferring with Posey, the pool attorney informed the court that the case which was the subject of the presentencing report did in fact involve Posey, but

Posey still believed that Cucco had not represented her. Posey also noted that she would waive any potential conflict of interest.

Defendant testified that he, too, was willing to waive any potential conflict of interest. The Prosecutor volunteered that "I don't think its something that Mr. Loyal can waive. . . . The first thing that's gonna come back if he gets convicted of this homicide on appeal is ineffective assistance of counsel. The first thing he was gonna say is there was a conflict of interest. . . ." The State submitted that "the jury could reason . . . that she's changing her mind now . . . [because of] the past representation of Mr. Cucco of that client. And the jury needs to know that information in order to effectually evaluate, especially in light of the *Gross* hearing and her recantation, and why she's recanting at this time."

The trial court reserved decision until after lunch so that the matter could be researched. After the recess, the State informed the court that it would withdraw its motion for a mistrial provided defendant supplied an express waiver and Cucco represented that he did not have any "confidential information regarding [Posey] . . . that he could possibly use as fruitful ground for cross-examination." In response, Cucco admitted that the presentence report established that he had previously represented Posey, however he repeated that he did not "recall anything about her. . . . I don't have any background information on her." Despite the fact that the prosecutor, defense attorney, and defendant informed the court of their desire to waive any potential conflict of interest based on alleged appearance of impropriety, the trial court declared a mistrial, citing *State v. Needham*, 298 *N.J.Super.* 100, 688 *A.*2d 1135 (Law Div.1996).

The trial court noted that when "an attorney's former client is the State's chief witness, it is beyond dispute that an appearance of impropriety is created requiring the attorney be disqualified." The court observed that although Posey could not realistically be classified as the State's chief witness, "she clearly is a key witness in that she indicates in a statement that the State is seeking to introduce that the defendant is the shooter." Furthermore,

"[t]here is an appearance [of impropriety] ... since this witness is now recanting, [and] this witness was once represented by Mr. Cucco. This defendant is currently represented by Mr. Cucco. It seems clear that this Appellate Division opinion does not give me the leeway to have anyone waive any possible conflict and have the trial proceed."

After dismissing the jury, the trial court admonished the State for failing to uncover this potential violation of *RPC* 1.7 and *RPC* 1.9 earlier. The court noted:

> [i]t is unfathomable to me that the State has an eyewitness, who defense attorney has been requesting Judgments of Convictions of since I recall the case being assigned to him, and it is only two weeks into trial that the State discovers that this recanting eyewitness was represented by defense counsel. I cannot understand how it happened. I cannot fathom how proper preparation by the State would allow it to happen ... two weeks into the trial.

Mr. Cucco argued that he had requested judgments of conviction for all of the State's witnesses, and only received from the State one page of what should have been a two-sided document concerning Posey, who apparently had two previous convictions. Cucco argued that he had established a rapport with defendant "over the last year and four months ... which the State is now in the position of being able to interfere with." Furthermore, he believed that he made "substantial ... points ... on the cross-examination of Colon .... [and now] the State's gonna get another chance at Mr. Loyal with the advantage of ... having additional opportunity to prepare a case that was marked ... ready for trial many months ago."

After the jury had been discharged, defense counsel moved to dismiss the indictment, arguing that a second trial would place defendant in double jeopardy, in violation of the federal and New Jersey Constitutions. Defendant blamed the mistrial on the State's dereliction in failing to provide both sides of Posey's Judgment of Conviction. The State responded that it did, in fact, forward both sides of the document to Cucco, and insinuated that Cucco either misplaced the second page or deliberately lost it. The court, believing that an issue of fact existed concerning

whether Cucco deliberately lost the document, called Cucco to the stand. Cucco testified that he only received one side of the Judgment of Conviction. At a second hearing, the court allowed the State assistant prosecutor who tried the case, Jerry Chambers, to testify with respect to whether he forwarded both sides of the document to defendant. Chambers testified that he remembered photocopying both sides of the document.

In an oral opinion, the court observed that when a mistrial results from good faith prosecutorial error and is required as a matter of necessity, the Double Jeopardy Clause does not prohibit a second trial. The court, citing *State v. Laganella,* 144 *N.J.Super.* 268, 365 *A.2d* 224 (App.Div.1976), framed the issue before it as whether the "prosecutor's actions or inactions bespeak bad faith and inexcusable neglect or oppressive conduct." The court concluded that the State's failure to provide the second side of the Judgment of Conviction was not deliberate. Thus, the court denied the motion to dismiss the indictment based on double jeopardy. In the subsequent trial, a jury convicted defendant on all counts and the court sentenced defendant to life in prison with thirty years of parole ineligibility for the murder. The State did not call Posey as a witness in the second trial.

On appeal, in an unpublished opinion, the Appellate Division affirmed the conviction, finding that the appearance of impropriety arising from Cucco's previous representation of Posey made the trial court's *sua sponte* grant of a mistrial a "manifest necessity." The appellate panel noted that under *R.P.C.* 1.7(c) a court should apply the "ordinary knowledgeable citizen" standard when determining whether a past representation poses substantial risk to the public or the client. The panel could not say "with certainty that such a risk did not exist in this case." Instead, the panel observed that "[t]here is the potential that Loyal's attorney may have obtained client confidences during that prior representation that could be used to aid in cross-examining Posey." The panel felt that the necessity for a mistrial increased because Posey was a recanting witness. "Of course," noted the panel, "we do not

suggest that the assigned public defender had done or would do anything unethical."

The panel remarked that "neither party obtained an advantage as a result of the mistrial nor were there other alternatives available to the judge." Therefore, the Appellate Division concluded "[t]he declaration of a mistrial in this case advances an important state policy and terminates a proceeding that would have produced results that potentially could have been overturned on appeal. Thus, the defendant's interests are outweighed by the competing demand for public justice."

## II.

### A.

Defendant argues that the trial court incorrectly determined that an appearance of impropriety existed under *R.P.C.* 1.7(c). Alternatively, defendant contends that even if an appearance of impropriety existed, it was not manifestly necessary to remove defense counsel and declare a mistrial, especially in light of the express waivers provided by defendant, the State, and Posey. The State asserts that defense counsel's prior representation of a key witness, who was now recanting her testimony, mandated counsel's disqualification and the declaration of a mistrial because of an unacceptable appearance of impropriety.

When an appellate court reviews a trial court's determination of whether a mistrial was manifestly necessary, a reviewing court must give deference to the trial court's factual findings. *Arizona v. Washington*, 434 *U.S.* 497, 515–16, 98 *S.Ct.* 824, 834–36, 54 *L.Ed.*2d 717, 734 (1978); *State v. Farmer*, 48 *N.J.* 145, 171, 224 *A.*2d 481 (1966), *cert. denied*, 386 *U.S.* 991, 87 *S.Ct.* 1305, 18 *L.Ed.*2d 335 (1967); *State v. Modell*, 260 *N.J.Super.* 227, 239–41, 615 *A.*2d 1264 (App.Div.1992), *certif. denied*, 133 *N.J.* 432, 627 *A.*2d 1138 (1993). Factual findings made by a trial court ordinarily should not be disturbed on appeal. *State v. Locurto*, 157 *N.J.* 463, 470–71, 724 *A.*2d 234 (1999). Deference, however, is not

accorded a trial court's determination with respect to the legal effect of those factual findings. *Manalapan Realty v. Manalapan Twp. Committee*, 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995); *State v. Brown*, 118 *N.J.* 595, 604, 573 *A.*2d 886 (1990). Although I accord deference to the trial court's factual findings, I disagree with its legal conclusion that a manifest necessity existed that required a mistrial.

### B.

It is axiomatic that a State may not put a defendant in jeopardy twice for the same offense. *Benton v. Maryland*, 395 *U.S.* 784, 795, 89 *S.Ct.* 2056, 2063, 23 *L.Ed.*2d 707 (1969). This fundamental right is protected by the federal Constitution, *U.S. Const.* amend. V, and the New Jersey Constitution, *N.J. Const.*, Art. I, par. 11. The protections provided by the federal and State constitutions are "coextensive in principle and scope." *State v. Farmer*, 48 *N.J.* 145, 168, 224 *A.*2d 481 (1966). The Double Jeopardy protections are not dependent on a completed trial; under both State and federal law jeopardy attaches to a defendant once a jury is empaneled and sworn. *United States v. Martin Linen Supply Co.*, 430 *U.S.* 564, 569, 97 *S.Ct.* 1349, 1353, 51 *L.Ed.*2d 642 (1977); *State v. Rechtschaffer*, 70 *N.J.* 395, 404, 360 *A.*2d 362 (1976). A second prosecution after an uncompleted trial implicates double jeopardy concerns because "[i]t increases the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted." *Arizona, supra*, 434 *U.S.* at 503–04, 98 *S.Ct.* at 829 (footnotes omitted). Thus, "as a general rule, the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial." *Id.* at 505, 98 *S.Ct.* at 830.

The prohibition on retrying a defendant after a mistrial, however, is not absolute. "[A] defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end

in just judgments." *Wade v. Hunter*, 336 *U.S.* 684, 689, 69 *S.Ct.* 834, 837, 93 *L.Ed.* 974 (1949). Courts may discharge a jury, over a defendant's objection, and still retry a defendant "whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated." *United States v. Perez*, 22 *U.S.* (9 *Wheat.)* 579, 580, 6 *L.Ed.* 165 (1824).

The "manifest necessity" standard has existed under the federal Constitution since at least 1824, *ibid.*, and has long been recognized as guiding our courts in interpreting New Jersey's double jeopardy prohibition under similar circumstances. *Farmer, supra,* 48 *N.J.* at 174–75, 224 *A.*2d 481; *see also N.J.S.A.* 2C:1–9d(3) (stating statutory pronouncement of manifest necessity rule). The "manifest necessity" standard cannot be applied mechanically, however, but must depend on the individual facts of the case at hand. *Illinois v. Somerville*, 410 *U.S.* 458, 462–63, 93 *S.Ct.* 1066, 1069–70, 35 *L.Ed.*2d 425 (1973); *Rechtschaffer, supra,* 70 *N.J.* at 405, 360 *A.*2d 362. Because a defendant's right to be free from double jeopardy is fundamental, the State shoulders a "heavy" burden of demonstrating the " 'manifest necessity' for any mistrial declared over the objection of the defendant." *Arizona, supra,* 434 *U.S.* at 505, 98 *S.Ct.* at 830. For example, the inability of a jury to decide on a verdict is considered a "manifest necessity" for declaring a mistrial over the objection of a defendant. *State v. Romeo*, 43 *N.J.* 188, 195, 203 *A.*2d 23 (1964), *cert. denied,* 379 *U.S.* 970, 85 *S.Ct.* 668, 13 *L.Ed.*2d 563 (1965). Conversely, the inability of a judge to complete a trial due to a death in the family does not constitute a manifest necessity for a mistrial, when alternatives are readily available. *Love v. Morton*, 112 *F.*3d 131, 137 (3d Cir.1997).

In the present case, the trial court declared a mistrial over the objection of defendant, the State, and the involved witness, based on an appearance of impropriety, allegedly prohibited by *R.P.C.* 1.7 and 1.9. As described above, the alleged appearance of impropriety concerned the fact that defendant's counsel, in his role

as public defender, represented a State witness two years earlier
in an unrelated matter. The question becomes whether an ap-
pearance of impropriety actually existed, and if so, whether that
appearance constitutes a manifest necessity for a trial court's *sua
sponte* declaration of a mistrial.

## C.

Our appearance of impropriety rule is part of our Rules of
Professional Conduct (*RPC*). It is contained in *R.P.C.* 1.7(c)(2)
and provides:

(2) in certain cases or situations creating an appearance of impropriety rather
than an actual conflict, multiple representation is not permissible, that is, in those
situations in which an ordinary knowledgeable citizen acquainted with the facts
would conclude that the multiple representation poses substantial risk of disservice
to either the public interest or the interest of one of the clients.

The phrase "appearance of impropriety" was first used in a 1932
Formal Opinion issued by an American Bar Association (ABA)
Committee interpreting the Canons of Professional Ethics. *See
ABA Comm. on Professional Ethics and Grievances, Formal Op.*
*77* (1932). The Committee determined that a part-time prosecutor
could not defend a client in a civil action while prosecuting him on
felony charges, even with the client's consent, because "[a]n
attorney should not only avoid all impropriety but should likewise
avoid the appearance of impropriety." *See ibid.;* Bruce A. Green,
*Conflicts of Interest in Legal Representation: Should the Appear-
ance of Impropriety Rule be Eliminated in New Jersey—Or
Revived Everywhere Else?,* 28 *Seton Hall L.Rev.,* 315, 315 (1997).
In 1969, "the ABA replaced the Canons with the Model Code of
Professional Responsibility" (Model Code or Code) and incorporat-
ed "the moral obligation to 'avoid the appearance of impropriety' "
in Disciplinary Rule (DR) 9–101, in Canon 9, and in Ethical
Considerations 9–3 and 9–6. Green, *supra,* 28 *Seton Hall L.Rev.*
at 316. As explained by one commentator, "The Model Code
includes Canons, Ethical Considerations and Disciplinary Rules.
The Canons state the standards expected of lawyers; the Ethical
Considerations state the objectives toward which every lawyer

should aspire; and the Disciplinary Rules state the minimum acceptable level of lawyer conduct." Elisabeth E. Boyan, *Reconsidering (Again) Conflicts of Interest Arising From Lawyers Representing Lawyers in New Jersey*, 9 *Geo. J. Legal Ethics* 1377, 1381 (1996).

Every state, except California, eventually "adopted a version of the Model Code recognizing this obligation." Green, *supra*, 28 *Seton Hall L.Rev.* at 317. In 1983, subsequent to the report of the Commission on Evaluation of Professional Standards (Kutak Commission) appointed by the ABA, the ABA replaced the Model Code with the Model Rules of Professional Conduct (Model Rules) and specifically eliminated the appearance of impropriety standard. *Id.* at 318.

In 1982, a special committee of the New Jersey Supreme Court (known as the Debevoise Committee, after its chairman, now-United States District Judge Dickinson R. Debevoise) recommended that New Jersey adopt the ABA Model Rules and abandon the appearance of impropriety standard. The Committee Report stated:

> New Jersey ... has continued ... to construe the rules as prohibiting any representation that the public might perceive as inappropriate because it somehow could create the appearance of something unseemly. In that construction New Jersey has stood almost alone. The Code of Professional Responsibility was drafted for the avowed purpose of expressing in black letter rules precisely what conduct or what omission would subject a lawyer to discipline, much as criminal statutes are intended to give fair warning in advance as to what specific conduct may result in penal sanctions.
>
> ....
>
> ... The present New Jersey approach unduly limits lawyers' representation of clients where no actual conflict exists and it unduly limits clients' selection of lawyers where no actual conflict exists. It imposes upon attorneys a disciplinary rule that is vague and undefined. The rule's contours are defined in retrospect on a case-by-case method, which is not a satisfactory procedure when dealing with rules of conduct. The proposed Model Rules carefully define the situations in which representation is proper and provide safeguards to ensure against improper representation.
>
> [*New Jersey Supreme Court Committee on the Model Rules of Professional Conduct, Report* (1983).]

The Court adopted most of the Committee's other recommendations, but chose to keep the appearance of impropriety standard, now codified at *R.P.C.* 1.7(c).

In adopting *R.P.C.* 1.7(c), New Jersey rejected the approach adopted by the majority of states. "As of the fall of 1995, thirty-eight states and the District of Columbia had adopted all, or significant portions, of the Model Rules," including those provisions abandoning the appearance of impropriety standard. Green, *supra*, 28 *Seton Hall L.Rev.* at 318, 318 n.20 (quoting Carol M. Rice, *The Superior Defense in Legal Ethics: Sending the Wrong Message to Young Lawyers*, 32 *Wake Forest L.Rev.* 887, 938 (1997)). The Model Rule is as follows:

RULE 1.7 CONFLICT OF INTEREST: GENERAL RULE

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2) each client consents after consultation.

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

At the request of a group of eight New Jersey law firms, this Court considered during the present term whether to eliminate the appearance of impropriety standard contained in *R.P.C.* 1.7(c)(2). *See Notice to the Bar*, 159 *N.J.L.J.* 843 (2000). The Supreme Court's Professional Responsibility Rules Committee (PRRC) recommended to the Court the elimination of the appearance of impropriety standard contained in *R.P.C.* 1.7(c)(2). *Ibid.* The PRRC concluded that:

There is no support for continuation of the "appearance of impropriety" standard. Efforts at its application are confounded by the vagueness and imprecision of the Rule itself, yet its specter creates undesirable adversarial tactics,

which result in limitations on the free selection of counsel. Lacking any real and clear parameters, it is surplusage, which should be eliminated from our Disciplinary Rules.

Raymond R. Trombadore, Esquire, a former member of the Debevoise Committee, a former chair of our Disciplinary Review Board, and a member of the ABA Standing Committee on Professional Discipline, in recommending the elimination of the rule, argued:

> We have now had sufficient experience with enforcement of the Rules of Professional Conduct .... the *RPC*s do work. They are comprehensive and they cover the situations intended to be covered by the old standards.... In almost every instance, disqualification or discipline based on 'appearance of impropriety' involves conduct violative of other Rules of Professional Conduct.... We no longer need the added comfort of a redundant rule which serves only to generate mischief....

Other attorneys argued that the rule is impossible to apply because of its indefiniteness, unpredictability, and that if it were a penal statute, it would be held to be unconstitutionally vague.

Professors Stephen Gillers of New York University School of Law and Bruce Green of Fordham University School of Law argued that the appearance of impropriety standard should be retained and applied only to government lawyers, criminal justice, and other situations that specifically implicate the public interest. Professor Geoffrey Hazard of the University of Pennsylvania Law School, and former Director of the American Law Institute, argued that the appearance standard is superfluous and used in New Jersey only "as an embellishment or exclamation point in decisions that rest on other grounds."

Ultimately, the Court decided not to determine whether to abolish *R.P.C.* 1.7(c)(2) until after the ABA's Commission on Evaluation of the Rules of Professional Conduct, known as Ethics 2000 Commission, has submitted its report. In the face of such emphatic condemnation of *RPC* 1.7(c)(2), even by the Court's own key committee, there are at least three substantial reasons why I do not believe that a violation of *R.P.C.* 1.7(c)(2) can satisfy the *Perez* manifest necessity requirement.

First, New Jersey is one of an overwhelming minority of states that prohibit attorney-client relationships which, while not violating a specific conflict of interest rule, create an "appearance of impropriety." Green, *supra*, 28 *Seton Hall L.Rev.* at 318–19. One respected commentator from New Jersey has concluded that we stand alone. Cynthia M. Jacob, *A Polemic Against R.P.C. 1.7(c)(2): The "Appearance of Impropriety" Rule,* New Jersey Lawyer, June 1996. Although Jacob has asserted that New Jersey stands alone, in *Berry v. Saline Mem. Hosp.,* 322 *Ark.* 182, 907 *S.W.*2d 736, 740 (1995), the Supreme Court of Arkansas was asked in a pretrial application to reconsider its position on the "appearance of impropriety" standard because "we are only one of three states retaining that standard." What is clear, however, is that no state has held that an appearance of impropriety that did not also involve an actual conflict can satisfy the *Perez* manifest necessity standard.

Our rule concerning an appearance of impropriety is an ethics rule. In *In re Garber,* 95 *N.J.* 597, 610, 472 *A.*2d 566 (1984), an attorney disciplinary case, we determined that an attorney's multiple and simultaneous representation of a recanting murder witness and the murder suspect, in unrelated actions, created an appearance of impropriety. This Court has never suggested, however, that if an attorney engages in conduct in a criminal case that creates an appearance of impropriety, the trial court can unilaterally discontinue a criminal trial to vindicate that ethical rule, without regard for the Double Jeopardy Clause. Yet, the majority opinion today has reached the strained and unconstitutional conclusion that breach of such a rule can satisfy the *Perez* manifest necessity standard. Such a ruling disregards the *ratio decidendi* of the Court's decision of only two years ago, which held that breach of our Rules of Professional Conduct, patterned after the American Bar Association's Model Rules, does not create a civil cause of action. *Baxt v. Liloia,* 155 *N.J.* 190, 197–204, 714 *A.*2d 271 (1998). Our ethics rules " 'intended to make clear that the purpose of the Model Rules was to regulate lawyer conduct through the disciplinary process, not to serve as a basis for civil

liability.'" *Id.* at 198, 714 *A.*2d 271 (quoting Model Rules of Professional Conduct, Scope (1992)). Even twenty years earlier in our now famous case of *In re Wilson,* 81 *N.J.* 451, 456, 409 *A.*2d 1153 (1979), the Court observed that the primary purpose of our rules of ethics "is to preserve the confidence of the public in the integrity and trustworthiness of lawyers in general." *Ibid.* If a breach of our appearance of impropriety rule cannot create civil liability, *a fortiori* such a violation may not satisfy the *Perez* manifest necessity standard. Further, nothing that we stated recently in *State v. Clark,* 162 *N.J.* 201, 744 *A.*2d 109 (2000), in which the Court exercised its authority to amend a practice and procedure rule, supports the majority's decision.

I am of the view that unless the violation of an ethics rule also violates a constitutionally-protected right of the State or a criminal defendant, such as the Fifth, Sixth or Fourteenth Amendment, an example of which is *Farmer, supra,* 48 *N.J.* at 167–177, 224 *A.*2d 481, such a violation may not satisfy the *Perez* manifest necessity standard required to justify granting a mistrial *sua sponte* once jeopardy has attached. Where jeopardy has attached, an appearance of impropriety violation should be addressed exclusively within the disciplinary system because that standard "was intended as a moral or prudential principle, not a legally enforceable norm." Green, *supra,* 28 *Seton Hall L.Rev.* at 357. That result is impelled, at least in part, by the fact that decision makers have no basis upon which to decide what the public would view as improper. "The appearance of impropriety test does not appear to be based upon any empirical studies of public sentiment." *Boyan, supra,* 9 *Geo. J. Legal Ethics* at 1385. I agree with Boyan that judges themselves "are critical of the appearance of impropriety standard because it calls upon them to 'divine' the public's interpretation of attorney actions." *Ibid.* Even if judges are able to determine public sentiment, the public may be wrong in certain cases. "What lay persons sometimes perceive as impropriety is frequently in the highest tradition of the bar: for example, representing unpopular clients, defending the guilty, and being courteous to opposing counsel during the course of a trial." Victor

H. Kramer, *The Appearance of Impropriety Under Canon 9: A Study of the Federal Judicial Process Applied to Lawyers,* 65 *Minn. L.Rev.* 243, 265 (1981). Yet, despite the vagueness, indefiniteness, and unpredictability of *R.P.C.* 1.7(c)(2), the Court today has elevated its status above well-established constitutional law.

Second, none of the cases decided under the appearance of impropriety rule raised any double jeopardy concerns. They all dealt with ethics problems, mostly in the context of pre-trial applications to remove an attorney from the case based on a conflict of interest. I can find no case law in this or any other jurisdiction, and the Court's majority opinion has cited none, that holds that an appearance of impropriety falls within a trial court's outer discretionary limit for granting mistrials based on the *Perez* manifest necessity standard. I am persuaded that a violation of our rule governing the appearance of impropriety is an insufficient basis to conclude "that the ends of public justice would not be served by a continuation of the proceedings." *United States v. Jorn,* 400 *U.S.* 470, 485, 91 *S.Ct.* 547, 557, 27 *L.Ed.*2d 543 (1971).

Reliance by the trial court and the majority on *State v. Needham, State v. Nappo, State v. Laganella,* and *State v. Farmer* is misplaced. First, *Needham* is a Law Division opinion. Second, the facts of that case make its holding inapplicable to this case. In *Needham,* a defendant barricaded himself in a home while threatening police with a gun. The State's "chief witness" was Officer Warner, the arresting officer who endured defendant's threats. 298 *N.J.Super.* at 103, 688 *A.*2d 1135. Defendant's attorney had represented Officer Warner seven years earlier in a criminal jury trial in which Officer Warner was acquitted, as well as in an unrelated internal affairs investigation that took place after defendant had been arrested in this case. Before the *Needham* trial began, the trial court disqualified the defendant's attorney based on an appearance of impropriety. Thus, *Needham* dealt with a pretrial motion to disqualify an attorney in an attempt to vindicate a criminal defendant's Sixth Amendment right to unconflicted representation. All of the interested parties waived

any potential conflict. No Fifth Amendment Double Jeopardy Clause issues were implicated.

*State v. Nappo,* 185 *N.J.Super.* 600, 450 *A.*2d 604 (1982), another Law Division decision, involved the dismissal of a municipal court complaint after some evidence had been presented, because the State refused to complete the trial within a reasonable time. *Id.* at 602–03, 450 *A.*2d 604. The dismissal was at *the request of the defendant.* A second prosecution was prohibited because of prosecutorial overreaching, such as a pattern of deliberate dereliction. A dismissal of a criminal complaint or indictment after some evidence has been presented is the functional equivalent to a mistrial. *State v. Lynch,* 79 *N.J.* 327, 341, 399 *A.*2d 629 (1979). A mistrial that is granted based on a defendant's application that does not involve prosecutorial overreaching or bad faith does not preclude a retrial under double jeopardy principles. *Oregon v. Kennedy,* 456 *U.S.* 667, 672–73, 102 *S.Ct.* 2083, 2087–88, 72 *L.Ed.*2d 416 (1982); *Farmer, supra,* 48 *N.J.* at 171, 224 *A.*2d 481.

In *State v. Laganella,* 144 *N.J.Super.* 268, 365 *A.*2d 224 (App. Div.1976), the trial court dismissed the indictment after the State had rested its case, on motion by the defendant, based on discovery violations. *Id.* at 277, 365 *A.*2d 224. The Appellate Division reversed and reinstated the indictment. *Id.* at 283, 365 *A.*2d 224. It found that double jeopardy principles did not preclude a retrial because the dismissal of the indictment was based on defendant's application in a case in which the State had not acted in bad faith. *Id.* at 288–89, 365 *A.*2d 224.

In *State v. Farmer, supra,* the trial court declared a mistrial *sua sponte* over defendant's objection in a murder case because the prosecutor mistakenly had failed to comply with a discovery order. The materials not disclosed in discovery were so important that defendant moved to prevent the prosecutor from using any evidence that related to the unrevealed discovery materials. The Court found that the mistrial was necessary to avoid depriving defendant of his right to a fair trial and effective assistance of counsel. *Farmer, supra,* 48 *N.J.* at 167, 224 *A.*2d 481. The Court

observed that had the trial been completed and defendant was convicted, the conviction would have been reversed. *Id.* at 175–77, 224 *A.2d* 481. Thus, the Court found that protecting defendant's Sixth and Fourteenth Amendment rights satisfied the *Perez* manifest necessity standard.

Similarly, the Court's reliance on other cases is misplaced. *Wheat v. United States, supra,* involved a pretrial application by the defendant to allow him to be represented by his co-defendant's attorney. The trial court denied the application, perceiving the potential for a real conflict, as opposed to an appearance of impropriety, that could deprive the defendant of his Sixth Amendment right to unconflicted representation. The denial of the defendant's application was affirmed. *Wheat, supra,* 486 *U.S.* at 164, 108 *S.Ct.* at 1700, 100 *L.Ed.*2d 140. *Wheat* does not involve the Double Jeopardy Clause and the present case does not involve the Sixth Amendment.

In *Arizona v. Washington, supra,* the Court found a mistrial declared over the defendant's objection did not preclude a retrial because defense counsel's "improper opening statement unquestionably tend[ed] to frustrate the public interest in having a just judgment reached by an impartial tribunal." 434 *U.S.* at 512, 98 *S.Ct.* at 834, 54 *L.Ed.*2d at 732. Thus, the overriding interest in the evenhanded administration of justice and the requirement of avoiding juror bias required by the Sixth and Fourteenth Amendments satisfied the manifest necessity standard.

In *State v. Modell, supra,* the trial court declared a mistrial when a witness for the State, who had been subpoenaed by the defendant, did not appear with records to give testimony for the defense. The trial court declared a mistrial *sua sponte* to protect defendant's Sixth and Fourteenth Amendment rights to a fair trial. *Modell, supra,* 260 *N.J.Super.* at 244–45, 615 *A.2d* 1264.

Unlike those cases, in this case defendant opposed the mid-trial mistrial, and it was not declared based on an actual conflict, prosecutorial overreaching or bad faith. Nor did the trial court declare a mistrial for the purpose of protecting defendant's consti-

tutional rights to a fair trial. The alleged appearance of impropriety was, at most, an ethical violation that would not have justified even the filing of an ethics complaint.

The majority cites four out-of-state cases to support its holding that an appearance of impropriety can create a manifest necessity for a mistrial. Those cases support my position rather than the Court's holding. In each case, the trial court expressly found an *actual* conflict of interest. *United States v. Simonetti*, 998 *F*.2d 39, 40 (1 st Cir.1993); *People v. McNally*, 107 *Cal.App*.3d 387, 165 *Cal.Rptr.* 715, 716–17 (1980); *In re Hoang*, 245 *Kan.* 560, 781 *P*.2d 731, 732 (1989), *cert. denied,* 494 *U.S.* 1070, 110 *S.Ct.* 1791, 108 *L.Ed*.2d 792 (1990); *Commonwealth v. Diehl,* 532 *Pa.* 214, 615 *A*.2d 690, 691 (1992). The appellate court in each case found a mistrial necessary to protect the defendant's Sixth and Fourteenth Amendment rights. In *Simonetti, McNally,* and *Hoang,* the courts declared mistrials after finding· that the conflicts of interest involved would preclude the defendant from receiving effective assistance of counsel. *Simonetti, supra,* 998 *F*.2d at 41–42; *McNally, supra,* 165 *Cal.Rptr.* at 718; *Hoang, supra,* 781 *P*.2d at 732. Similarly, in *Diehl,* after the court discovered that the prosecutor previously had represented the defendant in a matter *related to the defendant's criminal case,* the court declared a mistrial, observing that it was necessary to ensure that the defendant "would receive a trial by a fair and impartial jury which would return a verdict based solely on evidence adduced at trial." *Supra,* 615 *A*.2d at 692.

Conversely, in the present case, the trial court expressly found that no conflict of interest existed, and that there was no reason to believe that defense counsel's continued representation would be less than vigorous.

Third, even if it can be said that the appearance of impropriety rule was violated, and I maintain that it was not while giving deference to the trial court, defendant and the prosecutor could waive a potential conflict under the circumstances. Given that a defendant can waive constitutional rights, such as the right to an

attorney in a criminal case, *Faretta v. California,* 422 *U.S.* 806, 95 *S.Ct.* 2525, 45 *L.Ed.*2d 562 (1975); *State v. Crisafi,* 128 *N.J.* 499, 509, 608 *A.*2d 317 (1992), there is no reason why a defendant and the prosecutor could not waive an alleged appearance of impropriety. *See State v. Purnell,* 126 *N.J.* 518, 535–36, 601 *A.*2d 175 (1992) (holding a defendant could waive any conflict based on his attorney's previous representation of a State's witness in an unrelated matter). Here, defendant, the prosecutor, and Posey waived any violation of our appearance of impropriety rule. Those waivers provided the trial court with a viable option to a declaration of a mistrial *sua sponte.*

### III.

In *State v. Rechtschaffer, supra,* this Court noted that "[u]nquestionably a trial court has a discretionary range within which it may properly operate to grant a mistrial whether on its own motion or otherwise. But there are limits." 70 *N.J.* at 406, 360 *A.*2d 362 (internal citations omitted). The right to be free from double jeopardy must be balanced against the State's duty to ensure that a fair determination of guilt or innocence is made. *Wade, supra,* 336 *U.S.* at 689, 69 *S.Ct.* at 837, 93 *L.Ed.* 974; *Rechtschaffer, supra,* 70 *N.J.* at 405, 360 *A.*2d 362. I am persuaded that an *appearance* of impropriety does not interfere with the "public's interest in fair trials designed to end in just judgments." *Wade, supra,* 336 *U.S.* at 689, 69 *S.Ct.* at 837. Although the public's perception of fairness was an important State interest in this case, it cannot outweigh defendant's fundamental right to be free from double jeopardy. An appearance of impropriety, without more, does not interfere with the public's right to a fair determination of guilt or innocence, because the proceedings are, by definition, fair, since no actual conflict of·interest exists. If there was a violation of our appearance of impropriety rule, the New Jersey attorney disciplinary system is the place to resolve that issue, rather than a declaration of a mistrial over the ·objection of the defendant and the prosecutor. We have developed the

finest disciplinary system in the country to handle such ethics matters. *Baxt, supra,* 155 *N.J.* at 204 n. 3, 714 *A.*2d 271; *In re Konopka,* 126 *N.J.* 225, 236, 596 *A.*2d 733 (1991).

The Appellate Division's conclusion in the present case that defendant was not prejudiced by the disqualification of his attorney was incorrect. First, "the lack of demonstrable ... prejudice [does not] preclude the defendant's invocation of the double jeopardy bar in the absence of some important countervailing interest of proper judicial administration." *Illinois v. Somerville, supra,* 410 *U.S.* at 471, 93 *S.Ct.* at 1073. Second, there was substantial prejudice to defendant. At the time of the first trial, defendant had been in jail since his arrest some fourteen months earlier. After two weeks of trial, and after defendant's attorney cross-examined Colon, a State key witness, the court's order allowed the State to start afresh. Because of mistrial, defendant remained in prison while a new public defender began the time-consuming process of reviewing discovery, interviewing witnesses, and plotting trial strategy. I am convinced that the second trial increased "the financial and emotional burden on the accused, prolong[ed] the period in which he is stigmatized by an unresolved accusation of wrongdoing, and ... enhance[d] the risk that an innocent defendant may be convicted." *Arizona, supra* 434 *U.S.* at 503–04, 98 *S.Ct.* at 829, 54 *L.Ed.*2d 717. In other words, defendant undeniably suffered some of the very injustices that the Double Jeopardy Clause diligently guards against. Given the obvious prejudicial impact the mistrial had on defendant, it is difficult to comprehend how the need to uphold this State's much-maligned "appearance of impropriety" rule outweighs defendant's fundamental rights protected by the Double Jeopardy Clause. *See* Cynthia M. Jacob, *A Polemic Against R.P.C. 1.7(c)(2): The "Appearance of Impropriety" Rule,* New Jersey Lawyer, June 1996.

The Appellate Division also expressed its concern that the appearance of impropriety might allow defendant to claim ineffective assistance of counsel on appeal. It is clear, however, that any ineffective assistance claim would have been unsuccessful. In

*State v. Purnell, supra,* we found that a defendant did not receive ineffective assistance of counsel when defense counsel's law firm previously represented a State's witness in an unrelated matter and defendant expressly consented to continued representation. 126 *N.J.* at 535–36, 601 *A.*2d 175. It is confounding that this Court could so easily dispense with Purnell's ineffective assistance of counsel claim based on his consent, the fact that the witness in that case and Purnell were unrelated, and the lack of evidence that Purnell's counsel's representation was not "vigorous," and yet in this case, under similar facts, find that the trial court's grant of a mistrial was a "manifest necessity."

I find the case of *Love v. Morton* compelling. There, the Third Circuit, on federal habeas grounds, ruled that a trial court's *sua sponte* grant of a mistrial did not rise to the level of a manifest necessity. 112 *F.*3d 131, 137 (3d Cir.1997). In *Love,* the trial court declared a mistrial after a personal family matter precluded the judge from continuing. On federal habeas relief, the District Court of New Jersey found that a second trial was improper, and the Third Circuit affirmed. The Circuit Court stated that:

> [a]s a matter of law, declaring a mistrial in this case was not manifestly necessary when the decision to declare a mistrial *vel non* could have been postponed to the next morning. The delay would have given both the prosecutor and defense counsel, as well as the court, adequate time to consider alternative solutions to the sudden emergency.... When it comes to decisions squarely implicating the serious consequences of the Double Jeopardy Clause, the necessity for collected and composed contemplation assumes *a fortiori* proportions.
>
> [*Ibid.*]

In this case, the trial court declared a mistrial after utilizing a short lunch recess to consider the State's motion. After lunch, the State withdrew its motion, but the court did not take time to reflect on this significant new development. The State, when it withdrew its mistrial application, provided a means for reducing the significance of Cucco's prior representation of Posey: an express waiver from defendant, representations from defense counsel that he had no confidential information or recollection of Posey, and representations from Posey that she did not recall Cucco's representation of her. The trial court apparently believed

that consent was immaterial. Although *R.P.C.* 1.7(c)(1) does instruct that "in certain cases" consent may not overcome an appearance of impropriety, that statement is limited to whether the attorney may still face ethical charges. Clearly, *State v. Purnell, supra,* which is controlling in the area of criminal procedure, held that such a waiver is permitted. In this case, the representations of Cucco and Posey, when coupled with the State's and defendant's express waivers, provided the trial court with a viable alternative to a mistrial, even if an appearance of impropriety existed. In addition, the trial court also could have considered whether the substitution of a new attorney under *Rule* 1:11–2(a)(2) without the declaration of a mistrial would have been appropriate. Although I have the highest regard for the trial judge's judicial abilities, I am satisfied that the declaration of a mistrial was fatal to any further prosecution.

## IV.

For all of the foregoing reasons, I respectfully dissent from the Court's judgment finding that the second trial was not barred by the Double Jeopardy Clause of the Fifth Amendment as well as the comparable provision in our State Constitution. I would vacate the convictions and dismiss the indictment.

*For affirmance*—Chief Justice PORITZ and Justices O'HERN, STEIN, LONG, VERNIERO AND LaVECCHIA—6.

*For vacate and dismissal*—Justice COLEMAN—1.