NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0838-20T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ADRIENNE N. SMITH and
ORVILLE COUSINS,

     Defendants-Appellants.

_____

APPROVED FOR PUBLICATION

December 31, 2020

APPELLATE DIVISION

Argued December 7, 2020 – Decided December 31, 2020

Before Judges Fasciale, Mayer and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 17-08-1176.

Paul Darakjian argued the cause for appellant Adrienne Smith (Lucianna & Lucianna, PA, Frank Carbonetti, and Paul Darakjian, on the briefs).

Daniel S. Rockoff, Assistant Deputy Public Defender, argued the cause for appellant Orville Cousins (Joseph E. Krakora, Public Defender, attorney; Daniel S. Rockoff, of counsel and on the brief.).[1]

---

[1]  On December 2, 2020, former trial counsel for defendant Orville Cousins withdrew and Daniel Rockoff, Assistant Deputy Public Defender, executed a

William P. Miller, Assistant Prosecutor, argued the cause for respondent (Mark Musella, Bergen County Prosecutor, attorney; William P. Miller, on the brief).

The opinion of the court was delivered by

FASCIALE, P.J.A.D.

In this murder trial, which had been interrupted by the COVID-19 pandemic (the pandemic), where the jury had been impaneled and sworn and the trial was well under way, we granted defendants leave to appeal from a sua sponte order declaring a mistrial and denying their motions to dismiss the indictment on double jeopardy grounds. We did so to determine whether the ongoing pandemic provided a sufficient legal reason and manifest necessity for the judge to terminate the trial. It positively and decidedly did. In reaching our conclusion and declining to dismiss the charges, we applied age-old legal principles guiding the federal and state constitutional prohibition against double jeopardy.

The COVID-19 global pandemic has indiscriminately spread and continues to escalate throughout the United States. In New Jersey, the rapidly rising incidence of COVID-19 has necessitated stay-at-home orders and

---

substitution of attorney. Mr. Rockoff did not represent Cousins during the trial.

required certain operations cease to reduce the rate of community spread.[2]   As of mid-December, the Centers for Disease Control and Prevention (CDC) reported over 415,000 cases and over 18,000 fatalities in our state,[3] while the number of cases and fatalities across the country continue to rise at a staggering pace.[4]  In response to the public health hazard posed by COVID-19, courts nationwide have ordered the suspension of jury trials.[5]   Since early

---

[2]  See Exec. Order No. 107 (Mar. 21, 2020), 52 N.J.R. 544(a) (Apr. 6, 2020); Exec. Order No. 158 (June 29, 2020), 52 N.J.R. 1458(a) (Aug. 3, 2020); Exec. Order No. 173 (Aug. 3, 2020), 52 N.J.R. 1635(a) (Sept. 8, 2020); Exec. Order No. 204 (Nov. 30, 2020).

[3]  See CDC COVID Data Tracker, Ctrs. For Disease Control and Prevention, https://covid.cds.gov/covid-data-tracker/#cases. (last updated Dec. 17, 2020).

[4]  As of December 18, 2020, the CDC reports that the total cases in the United States is over 16,000,000 and total fatalities over 306,000.  See CDC COVID Data Tracker, Ctrs. For Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#cases. (last updated Dec. 17, 2020).

[5]  As of November 20, 2020, twenty-six district courts have suspended jury trials, while many others have taken steps to reduce the risk of infection while conducting trials.  See Courts Suspending Jury Trials as COVID-19 Cases Surge, United States Courts (Nov. 20, 2020), https://www.uscourts.gov/news/2020/11/20/courts-suspending-jury-trials-covid-19-cases-surge.  Additionally, seven states and the District of Columbia have suspended jury trials until further notice, four states have suspended jury trials until January, and four states have suspended jury trials until February. See Coronavirus and the Courts, Nat'l Ctr. for State Courts, https://www.nscs.org/newsroom/public-health-emergency. (last visited Dec. 14, 2020).  The remaining states have not issued statewide orders suspending jury trials, but some have issued local orders affecting the continuation of jury trials. Id.

3

March, the New Jersey Supreme Court has regularly provided significant updates regarding how the administration of justice could be accomplished within the confines of state and local COVID-19 regulations.[6] Our Court continues to meticulously monitor the trajectory of COVID-19 cases statewide and is consistently balancing the competing interests of those involved in jury trials, such as defendants, victims, jurors, counsel, and members of the judiciary. The judge carefully navigated the trial through these challenging times.

We hold that the COVID-19 pandemic—an unexpected, untoward, and undesigned public health crisis, which does not bespeak bad faith, inexcusable neglect, inadvertence, or oppressive conduct by counsel—coupled with the unique facts of this case, presents a legally sufficient reason and manifest necessity to terminate defendants' trial. In analyzing whether to sua sponte terminate a trial due to the COVID-19 pandemic after a jury has been impaneled and sworn, trial judges should consider: (1) the circumstances that created the urgent need to discontinue the trial, including whether it was due to bad faith, inexcusable neglect, inadvertence, oppressive conduct, or prosecutorial or defense misconduct; (2) the existence of viable alternatives;

---

[6] See NJCourts COVID-19 Updates, New Jersey Courts, https://njcourts.gov/public/covid19.html. (last visited Dec. 17, 2020).

A-0838-20T4

(3) the extent of any prejudice to a defendant by a second trial; (4) whether a second trial accords with the ends of public justice and judicial administration; and (5) any other relevant factors unique to the facts of the case.

Here, the judge considered these factors and did not abuse his discretion by sua sponte declaring the mistrial. In performing his sound analysis, the judge properly balanced defendants' constitutional and statutory rights while maintaining the public's interest in fair trials, mindful of the unique and unprecedented public health risks facing participants owing to the COVID-19 pandemic. Consequently, we conclude that double jeopardy does not bar a subsequent trial.

We therefore affirm.

## I.

Defendants Adrienne Smith and Orville Cousins are siblings. According to the State, Smith killed her husband and worked with Cousins to hide the body. On August 30, 2017, a Bergen County grand jury indicted Smith for first-degree murder, N.J.S.A. 2C:11-3(a)(1)(2); and third-degree hindering her own detention or apprehension, N.J.S.A. 2C:29-3(b)(4). It indicted Smith and Cousins for second-degree desecrating, damaging, or destroying human remains, N.J.S.A. 2C:2-6 and N.J.S.A. 2C:22-1(a)(2); second-degree unlawfully disturbing, concealing, moving, or concealing human remains,

5

N.J.S.A. 2C:2-6 and N.J.S.A. 2C:22-1(a)(1); and third-degree suppressing by way of concealment or destruction of evidence, N.J.S.A. 2C:2-6 and N.J.S.A. 2C:29-3(b)(1).

Jury selection began on January 7, 2020 and was protracted because of the number of witnesses expected to testify and the anticipated length of trial. The trial judge, Judge Christopher R. Kazlau, advised the jurors that a lengthy commitment was required, and that trial would be completed on or before April 9, 2020. On February 12, 2020, the trial commenced. At that point, there was limited public knowledge about the COVID-19 virus and how it would eventually spread.[7] The gravity of the COVID-19 pandemic quickly became more apparent and, on March 12, 2020, the jury sent a note to the judge requesting that he address how the pandemic would affect the case and their service. The judge addressed the question on the record in the presence of the parties with the information available to him at that time.

On March 15, 2020, our Supreme Court suspended all jury trials. See Notice New Jersey Court Operations—COVID-19 Coronavirus: Rescheduling

---

[7] See Michelle A. Jorden & M.D., Sarah L. Rudman, M.D., et. al, Evidence for Limited Early Spread of COVID-19 Within the United States, Ctrs. For Disease Control and Prevention Morbidity and Mortality Weekly Report 682-683 (June 5, 2020), https://www.chttps://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6922e1-H.pdfdc.gov/mmwr/volumes/69/wr/pdfs/mm6922e1-H.pdf.

of In-Court Proceedings Scheduled for the Week Beginning Monday, March 16, 2020; Continuation of All Critical Functions 1-3 (March 15, 2020). In accordance with our Supreme Court's order, and through no fault of any of the participants, the trial could not continue. Accordingly, on March 17, 2020, the judge advised the jurors that the trial was postponed and that they would be notified when their service at trial would resume. At the time the trial was suspended the State was still presenting its case with its twenty-ninth witness on the stand. The State disclosed that it anticipated calling an additional three to four witnesses before it would rest.

Three months later, Judge Glenn A. Grant, J.A.D., Acting Administrative Director of the Courts, issued a notice to the bar continuing the suspension of new trials but providing for the resumption of "ongoing jury trials suspended during COVID-19 . . . consistent with public health precautions with the consent of all parties[.]" Notice to the Bar COVID-19— Fourth Omnibus Order on Court Operations and Legal Practice 1 (June 11, 2020) (Fourth Omnibus Order). Thereafter, on June 22, 2020, two jurors contacted the judge to inquire about their obligations moving forward. One juror asked about the status of trial and whether she could take a planned vacation. Another juror called to advise the judge that he had started a new job and asked to be excused.

On July 22, 2020, our Supreme Court authorized incremental resumption of certain new criminal and civil trials, without the consent of the parties. See Notice to the Bar COVID-19—Criminal and Civil Jury Trials to Resume Incrementally Using a Hybrid Process with Virtual (Video) Jury Selection and Socially Distanced In-Person Trials (July 22, 2020). In its Seventh Omnibus Order, the Court authorized "trials to be conducted in person with social distancing, consistent with the Court's July 22, 2020 Order[.]" See Notice to the Bar COVID-19—Seventh Omnibus Order on Court Operations and Legal Practice–Concluding Certain General Extensions; Continuing Individualized Adjustments (July 24, 2020).

In accordance with our Supreme Court's orders, the judge took steps to safely resume the trial. The judge conducted multiple status conferences to ensure the proceedings would comply with the CDC and Administrative Office of the Courts (AOC) guidelines. Along these lines, he made numerous proposals to the parties.

The judge proposed resuming the trial in a larger courtroom, which would allow for social distancing[8] in accordance with the Court's July 22, 2020

---

[8] The CDC defines "social distancing" as the practice of staying at least six feet from other people who are not from your household. See Social Distancing, Ctrs. for Disease Control and Prevention,

A-0838-20T4

Order.  He also discussed resuming trial with all participants wearing personal protective equipment, including face shields and masks, and installing plexiglass barriers.  He invited counsel to inspect the larger courtroom and the jury room, which they declined to do.

The State consented to the resumption of the trial using these mitigation and safety measures.  Defendants did not.  Defendants themselves suffer from underlying health conditions and preferred remaining incarcerated rather than resuming the trial.[9]  The CDC has recognized that individuals with certain conditions may be at an increased risk for severe illness from the COVID-19 virus.[10]

Defense counsel also objected to social distancing and mask protocols and expressed concern that the protocols would compromise their ability to effectively represent their clients should trial resume.   Cousin's attorney expressed safety concerns about resuming the trial given his own age.  One of

_____

https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html. (last updated Nov. 17, 2020).

[9]  We considered defendants' health conditions, as did the judge, but there is no need to disclose them, especially in a published opinion.

[10]  See People with Certain Medical Conditions, Ctrs. for Disease Control and Prevention,         https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. (last updated Dec. 1, 2020).

A-0838-20T4

Smith's attorneys,[11] who is ninety-seven-years old, objected to resuming the trial "for the health and safety of all involved." The CDC has found that COVID-19 is particularly devasting to individuals in counsels' age groups, making them more than ninety times more likely to die from COVID-19 and at least five times more likely to be hospitalized than individuals age eighteen to twenty-nine.[12] Smith's second attorney expressed a desire to resume the trial only under the "gold standard" that existed prior to the pandemic, meaning a trial conducted under normal circumstances and without COVID-19 precautions. The judge did not fault, nor do we, the collective positions of defendants or their counsel.

On October 23, 2020, four months after our Supreme Court authorized resumption of jury trials, the judge informed counsel and the parties at another status conference on the record that he was considering terminating the trial given the "very high risk of prejudice" to defendants as a result of the seven-month suspension of the trial "with really no end in sight." The judge asked

---

[11] Smith is represented by two attorneys in this matter: Frank Carbonetti and Frank Lucianna.

[12] See COVID-19 Hospitalization and Death by Age, Ctrs. for Disease Control and Prevention, Ctrs. for Disease Control and Prevention, https://cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age.html. (last updated Aug. 18, 2020).

A-0838-20T4

the parties to brief the issue, and three days later the judge conducted oral argument.

Defendants objected to the judge declaring a mistrial, refused to resume the trial because of health risks, and requested continued suspension of the trial until—in their view—they could return to the "gold standard" conditions that existed before the pandemic, or until the Supreme Court itself ordered resumption of the trial. They argued that double jeopardy would attach if the judge declared a mistrial over the parties' objections. Although the State objected to a mistrial, it recognized the reality that the suspension of the case could not "linger in perpetuity." But the State contended that if the judge declared a mistrial, double jeopardy would not attach because defendants remained unwilling to resume the trial.

On October 26, 2020, seven months after the judge suspended the trial, he sua sponte declared a mistrial and entered the order under review.[13] In his oral decision, the judge explained that a manifest and overriding necessity required the declaration of a mistrial. The judge also found that when he suspended the trial in March 2020, there were, in his estimation, "many days," "if not weeks," remaining of the trial. The State expected to produce

---

[13] Defendants did not seek permission to file an emergent motion challenging this order, or otherwise move to stay the order pending their motion for leave to appeal.

A-0838-20T4

additional witnesses before it rested; if they desired to do so, defendants had their case to present to the jury; adequate time would be allocated for any motions; the charge conference remained; the jury charge had to be given; and the jury needed to sufficiently deliberate.  The judge explained:

> At this time, we face an uncertain time table as to when the pandemic will be [over] and or whether there will be vaccines and or treatments available such that the resumption of this trial may occur under the circumstances that existed prior to the suspension of the trial.  At the very least, most optimistically, that would be months from now.
>
> The circumstances that have resulted in the suspension of this trial are historic and unprecedented.  Both the State and defendants submitted that they wish to preserve this jury moving forward.  However, this [c]ourt finds that after a seven[-]month delay and with all of the attendant circumstances and actual and potential consequences flowing from that delay, the pandemic, the prospect of an indefinite further delay that will last months, that termination of this trial is required by manifest [or] overriding necessity.
>
> [Defendant] Smith faces life in prison if convicted.  [Defendant] Cousins faces up to [twenty-five] years in prison if convicted.  I have substantial concern that the trial's result will be tainted, even if the trial were to resume today, let alone months from now[.]

The judge found that there were no viable alternatives to terminating the trial.  He reached this conclusion after conducting multiple conferences at which he discussed with counsel steps to ensure compliance with CDC and AOC guidelines, including "the need to voir dire the jury prior to resuming the

trial, the potential complications with resuming after . . . a lengthy delay [of seven months] and the jurors' recollection of testimony and the potential need for playback of testimony, months removed from when the jury first heard the testimony, with the witnesses, in person." The judge noted that playback would likely be insufficient because it "would occur many months removed from when [the jury] actually had the opportunity to listen to the testimony, view the evidence and do that in conjunction with an assessment and evaluation of the demeanor of the witnesses." The judge also considered the "burden, sacrifice, and hardship on [the] jury."

Defendants and defense counsel remained steadfast in their safety concerns. The judge did not fault them for raising these concerns and found that defendants were not "acting in bad faith" by withholding their consent. However, the judge noted—consistent with his efforts—that our Supreme Court permitted resumption of jury trials consistent with public health precautions.

Notably, the judge found the circumstances that created this situation involved "an unprecedented global pandemic that has impacted the functions of our judicial system in New Jersey and impaired the ability of this [c]ourt to resume this trial under the conditions in which it began." He continued, explaining "[t]his situation certainly was not created by any prosecutorial

13

misconduct, as the State has been ready and waiting to resume from the very day months ago when it was permitted," and "[t]he initial suspension of trial in March [2020] due to the pandemic was beyond the control of all parties and resulted in an arguably untenable delay, threatening the fairness of the trial, even at the time [our] Supreme Court allowed the resumption of suspended trials in June [2020]."

The judge rejected the State's argument that, as an alternative, the jury should have been polled about their future availability to resume the trial prior to declaring a mistrial. The judge found that polling the jury did not "address the effect of what is sure to be a month[s-]long additional delay" or possibly "an indefinite delay" on the jury's recollection of the evidence and ability to serve. Looking long term, "[e]ven if the trial were to resume at some point with the existing jury, if the defendants were convicted, the effects of the extraordinary circumstances under which this trial was suspended, resumed, and concluded would inevitably form a basis for appeal[.]" See State v. Loyal, 164 N.J. 418, 437 (2000) (noting that "if a mistrial vindicates a significant state policy and 'aborts a proceeding that at best would have produced a verdict that could be upset by one of the parties,' a defendant's interest may be outweighed by the 'equally legitimate demand for public justice.'") (quoting Illinois v. Somerville, 410 U.S. 458, 471 (1973)).

Thus, the judge found that there was

> an urgent need to discontinue the trial . . . to safeguard the defendants from any prejudice stemming from the delay and to protect the ends of public justice, as the totality of the circumstances of the continued suspension have only eroded and will continue to erode the prospects of a fair and just result in this trial.
>
> . . . [Defendant] Smith faces life in prison if convicted and [Defendant] Cousins theoretically faces up to [twenty-five] years. This [c]ourt is aware of the sacredness of the lives before me but also the sacredness of the life that was taken.
>
> In the interest of justice, a second trial will proceed consistent with public health precautions at a date to be determined. A second trial will not prejudice the defendants and this [c]ourt finds it's necessary not only to safeguard the rights of the defendants to a full and fair trial but also to protect the interest of the public, to have its trial processes applied fully and fairly in the due administration of criminal law.
>
> Under all the circumstances of this case, balancing the interest of the defendants and the public, a mistrial is warranted[,] and it is not fundamentally unfair to require retrial of the defendants.

Three weeks after the judge declared the mistrial, on November 16, 2020, and in response to the second wave of the pandemic, our Supreme Court again suspended new in-person jury trials based on COVID-19 trends and health and safety concerns. See Notice to the Bar COVID-19—Suspension of New In-Person Jury Trials and In-Person Grand Jury Sessions; Revised End-

15

Dates for Excludable Time (Nov. 16, 2020) (November 16, 2020 Suspension).

In its order, our Supreme Court stated:

> In its initial response to the COVID-19 crisis, the Court in March 2020 authorized a swift transition from in-person to remote court operations. When the virus generally was controlled in New Jersey, the Court in June 2020 announced a statewide progression from Phase 1 to Phase 2 of its post-pandemic plan, including the incremental resumption of certain in-person matters. In the past several months, the Court gradually expanded the scope of events and services that could be conducted in person.
>
> Judges at all levels of the courts have now conducted more than 100,000 remote court events involving more than 1.2 million participants. At the same time, limited in-person proceedings, including socially distanced jury trials and in-person grand jury sessions, have enabled progress in areas that had slowed during fully remote operations. Among other steps, the Court in its July 22, 2020 Order authorized the resumption of jury trials in a hybrid format including primarily virtual jury selection and socially distanced in-person trials. Verdicts have been returned in a number of criminal and civil cases, and the scheduling and conferencing of cases for real trial dates has prompted resolutions in more than 115 criminal cases, involving more than [sixty] detained defendants, as well as settlements in more than 225 civil cases.
>
> [Id. at 1-2.]

The Court explained that "[t]he increasing rates of new cases, hospitalizations, and deaths make it impracticable and unsafe for certain in-person court events to continue at the level reached during the past few

16

months." Id. at 3. Thus, "[a]lthough it is not necessary at this time to prohibit all on-site presence and in-person events at court locations, in-person jury trials and in-person grand jury sessions will now be suspended based on current COVID-19 trends and health and safety concerns." Ibid. Additionally, the Court provided, as it had done so in earlier orders, that

> [i]n recognition of the pervasive and severe effects of the COVID-19 public health crisis, the [trial judge] in any individual matter consistent with Rule 1:1-2(a) may suspend proceedings, extend discovery or other deadlines, or otherwise accommodate the legitimate needs of parties, attorneys, and others in the interests of justice[.]
>
> [Id. at 6.]

## II.

On appeal, defendants argue that the judge abused his discretion by sua sponte declaring a mistrial because there was no "manifest necessity." They maintain that double jeopardy bars retrial and urge us to dismiss all charges in the indictment. They argue the judge acted with "imprudent haste," failed to consider alternatives to a mistrial, including polling the jury, and that he lacked the authority to declare a mistrial due to the Omnibus Orders. Defendants further contend they suffered prejudice, and that they did not waive their constitutional right to be free from double jeopardy by withholding their consent to resume trial.

17

The State argues that retrial is permissible under N.J.S.A. 2C:1-9(d)(3) because the mistrial declaration was "required by a sufficient legal reason and a manifest or absolute or overriding necessity." In addition, the State asserts alternatively that retrial is permissible under N.J.S.A. 2C:1-9(d)(1) because defendants' adamant refusal to resume trial "could fairly be considered a waiver of their right to object to the trial's eventual (and completely foreseeable) termination."[14]

## III.

"Appellate courts 'will not disturb a trial [judge's] ruling on a motion for a mistrial, absent an abuse of discretion that results in a manifest injustice.'" State v. Smith, 224 N.J. 36, 47 (2016) (quoting State v. Jackson, 211 N.J. 394, 407 (2012)). Pertinent to this appeal, "appellate reluctance to interfere with a sua sponte declaration of a mistrial should be even more pronounced where it is plain that a primary motive for the trial judge's course was solicitude for the

---

[14] Because we agree that manifest necessity existed, we need not address the State's alternative argument that retrial was permissible under N.J.S.A. 2C:1-9(d)(1). We note briefly N.J.S.A. 2C:1-9(d)(1) provides that termination of a trial is not improper if "[t]he defendant . . . waives . . . his right to object to the termination." Here, defendants forcefully and consistently objected to the mistrial. Withholding consent to resumption of the trial during the pandemic, given their high-risk medical condition, does not counter that opposition. See State v. Barnes, 261 N.J. Super. 441, 447 (App. Div. 1993) (indicating that we rejected the trial court's finding that the defendant acquiesced in the declaration of a mistrial because the defendant expressly reserved his right to move for a dismissal of the charges).

defendant's interests." State v. Farmer, 48 N.J. 145, 171 (1966). Where a trial judge sua sponte declares a mistrial over the objections of the State and defendants, the "propriety of the mistrial depends upon the sound exercise of the [trial judge's] discretion." Loyal, 164 N.J. at 436 (quoting State v. Rechtschaffer, 70 N.J. 395, 406 (1976)). "[D]iscretion is exercised improperly . . . if the [trial judge] has an appropriate alternative course of action." State v. Allah, 170 N.J. 269, 281 (2002).

## A.

We begin our analysis by reaffirming certain bedrock principles of our criminal justice system. The Double Jeopardy Clause of the Fifth Amendment of the United States Constitution guarantees that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The New Jersey Constitution similarly provides that "[n]o person shall, after acquittal, be tried for the same offense." N.J. Const. art. I, ¶ 11. Our Supreme Court "has consistently interpreted the State Constitution's double-jeopardy protection as coextensive with the guarantee of the federal Constitution." State v. Miles, 229 N.J. 83, 92 (2017). Along these lines, it is well settled that "a trial [judge] must dismiss an indictment if prosecution would violate the defendant's constitutional rights" of freedom from double jeopardy. State v. Abbati, 99 N.J. 418, 425 (1985).

When the defendant is tried by a jury in a criminal case, double jeopardy protections are not dependent on a completed trial, but rather "attaches after the jury is impaneled and sworn." Allah, 170 N.J. at 279. "Because jeopardy attaches before the judgment becomes final, the constitutional protection also embraces the defendant's 'valued right to have his trial completed by a particular tribunal.'" Arizona v. Washington, 434 U.S. 497, 503 (1978) (quoting Wade v. Hunter, 336 U.S. 684, 689 (1949)). From that point on the defendant "is entitled to have the trial proceed to its normal conclusion, i.e., judgment by the [trial judge] or verdict of the jury." Farmer, 48 N.J. at 169. "If the jury is discharged before that time without [the defendant's] consent or without legal justification, the abortive ending is equivalent to acquittal and bars retrial." Ibid.

The Double Jeopardy Clause does not, however, "create an absolute bar in every case of retrial." State v. Dunns, 266 N.J. Super. 349, 362 (App. Div. 1993). "[A] defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments." Wade, 336 U.S. at 689. That is not a foreign concept in New Jersey. We have likewise stated "[t]o set free criminal suspects whenever a trial is aborted would deny the innocent the protection due them and defeat the social contract upon which government is based."

20

State v. Torres, 328 N.J. Super. 77, 86 (App. Div. 2000).  In 1966, Justice John

J. Francis writing for the majority in Farmer explained:

> the double jeopardy protection does not mean that once an accused has been put on trial regularly, the proceeding must run its ordinary course to judgment of conviction or acquittal.  The rule does not operate so mechanistically.  If some unexpected, untoward and undesigned incident or circumstance arises which does not bespeak bad faith, inexcusable neglect or inadvertence or oppressive conduct on the part of the State, but which in the considered judgment of the trial [judge] creates an urgent need to discontinue the trial in order to safeguard the defendant against real or apparent prejudice stemming therefrom, the Federal and State Constitutions do not stand in the way of declaration of a mistrial.  And this is true even if the conscientious act of the trial judge may be characterized as the product of "extreme solicitude" or "overeager solicitude" for the accused.  Moreover, if an incident or circumstance of that nature moves the [trial judge] to order a mistrial not only to safeguard the right of the defendant to a full and fair trial, but also to protect the right of society to have its trial processes applied fully and fairly in the due administration of the criminal law, there is even less basis for a claim of trespass upon the privilege against double jeopardy.  Clearly the societal right to have the accused tried and punished if found guilty stands side by side with the right of the accused to be prosecuted fairly and not oppressively.  While the public right, when it must be considered alone, may not weigh as heavily in the scale as that of the defendant because of the constitutional dimensions of the privilege against double jeopardy and the superior capacity of the State to investigate and prepare for prosecutions, nevertheless when exercise of the trial [judge's] discretion may fairly be said to serve both interests,

A-0838-20T4

there is certainly less substantial reason to question its propriety.

[Farmer, 48 N.J. at 174-75 (emphasis added) (citations omitted).]

Of course, it is well established that mistrials declared with the defendants' consent do not bar retrial. State v. Kelly, 201 N.J. 471, 485 (2010). But even if a defendant objects to the declaration of a mistrial, as in this case, "termination of a trial after jeopardy attaches does not necessarily prohibit subsequent re-prosecution." Allah, 170 N.J. at 280. "Only the improper termination of proceedings bars retrial." Ibid. "Where the [trial judge] finds a sufficient legal reason and manifest necessity to terminate a trial, the defendant's right to have his initial trial completed is subordinated to the public's interest in fair trials and reliable judgments." Loyal, 164 N.J. at 435 (citing Wade, 336 U.S. at 689).

Referring to longstanding legal principles even before Farmer, the New Jersey Supreme Court set out general guidelines for determination of whether the discharge of the jury prior to verdict is justified:

> "[I]f the trial was terminated or the jury discharged before verdict because of incapacitating illness of the judge or a juror or jurors or of the defendant, or misconduct or disqualification of some members of the jury, or on account of an untoward incident that renders a verdict impossible, or some undesigned matter of absolute necessity, or the failure of the jury to agree upon a verdict after a reasonable time for

22

deliberation has been allowed, subsequent prosecution for the offense [is] not barred," for reasons of justice and the public interest.

[State v. Romeo, 43 N.J. 188, 195 (1964), cert. denied, 379 U.S. 970 (1965) (second alteration in original) (quoting State v. Williams, 30 N.J. 105, 121 (1959)).]

In addition to the constitutional prohibition, defendants are also "provid[ed] statutory protection from double jeopardy[.]" Allah, 170 N.J. at 279. The New Jersey Legislature enacted N.J.S.A. 2C:1-9, which effectively "adopted the test enunciated in State v. Romeo[.]" Dunns, 266 N.J. Super. at 364. N.J.S.A. 2C:1-9(d)(3) provides that the prohibition of double jeopardy does not apply where "[t]he trial [judge] finds that the termination [of the trial] is required by a sufficient legal reason and a manifest or absolute or overriding necessity." If a trial is terminated over the objection of a defendant due to a manifest necessity, "a second proceeding is constitutionally permissible." Torres, 328 N.J. Super. at 86.

In balancing the competing interest of such a mistrial, "[t]he manifest necessity standard provides sufficient protection to the defendant's right in having his case decided by the jury first selected while maintaining the public's interest in fair trials designed to conclude in just judgments." Ibid. As the United Stated Court of Appeals for the Third Circuit has recently and insightfully proclaimed:

The Fifth Amendment's Double Jeopardy Clause ordinarily bars retrials. But a retrial after a mistrial does not amount to double jeopardy when the mistrial was manifestly necessary. Though manifest necessity requires a "high degree of necessity," making that judgment call is "reserved to the broad discretion of the trial judge." We scrutinize a mistrial more closely if the trial judge has not exercised his "sound discretion" or if the prosecutor appears to be "harass[ing]" or gaining a "tactical advantage over the accused."

[Orie v. Sec'y Pennsylvania Dep't of Corr., 940 F.3d 845, 851 (3d Cir. 2019) (alteration in original) (first quoting Renico v. Lett, 559 U.S. 766, 774 (2020); then quoting Arizona, 437 U.S. at 508, 510 n.28).]

"The 'manifest necessity' standard has existed under the federal Constitution since at least 1824, . . . and has long been recognized as guiding our courts in interpreting New Jersey's double jeopardy prohibition under similar circumstances." Loyal, 164 N.J. at 453 (Coleman, J., dissenting). "Because a defendant's right to be free from double jeopardy is fundamental, the State shoulders a 'heavy' burden of demonstrating the '"manifest necessity"' for any mistrial declared over the objection of the defendant.'" Ibid. (quoting Arizona, 434 U.S. at 505).

Determining whether manifest necessity or the ends of public justice require a trial judge to declare a mistrial depends on the unique facts of the case and the sound discretion of the trial judge. Ibid. As the United States Supreme Court noted,

24

the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated.  They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere.  To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes[.]

[United States v. Perez, 22 U.S. (9 Wheat.) 579, 580 (1824).]

But there are no rigid rules as to what constitutes "manifest necessity," and "[b]oth the United States and the New Jersey Supreme Courts have recognized that it is impossible to define all of the circumstances where there is sufficient reason to declare a mistrial."  Dunns, 266 N.J. Super. at 364; see Renico, 559 U.S. at 774 (noting that "the 'manifest necessity' standard 'cannot be interpreted literally,' and that a mistrial is appropriate where there is a '"high degree"' of necessity." (citing Arizona, 434 U.S. at 506)).

B.

That brings us to the heart of this case: whether the ongoing global COVID-19 pandemic—and its associated enormous practical challenges to the fair and just administration of justice—provided the judge with a sufficient

25

legal reason and manifest necessity, under the unique facts of this case, to terminate the trial without violating defendants' double jeopardy rights.

Clearly, "[w]hether 'manifest necessity' or 'the ends of public justice' require declaration of a mistrial depends on the unique facts of the case and the sound discretion of the trial [judge]." Loyal, 164 N.J. at 435. It is undisputed that these particular facts—in the midst of a global pandemic—are unique. That is an understatement.

In reviewing a trial judge's sua sponte decision to terminate a jury trial after the jury had been sworn, because in the trial judge's judgment a sufficient legal reason and manifest necessity exists to warrant a mistrial, we turn to guidance from our Supreme Court, which provided relevant considerations:

> Did the trial [judge] properly exercise [his or her] discretion so that a mistrial was justified? Did [the trial judge] have a viable alternative? If justified, what circumstances created the situation? Was it due to prosecutorial or defense misconduct? Will a second trial accord with the ends of public justice and with proper judicial administration? Will the defendant be prejudiced by a second trial, and if so, to what extent?
>
> [Id. at 437 (quoting Rechtschaffer, 70 N.J. at 410-11).]

To our knowledge, there are no published opinions in New Jersey squarely dealing with this inquiry.

In exercising sound judgment about whether the ongoing COVID-19 pandemic provides a sufficient legal reason and manifest necessity to sua

26

sponte terminate a trial without violating a defendant's double jeopardy protections, and adhering to guidance provided by our Court, we have extrapolated from the caselaw certain factors for trial judges to consider: (1) the circumstances that created the urgent need to discontinue the trial, including whether it was due to bad faith, inexcusable neglect, inadvertence, oppressive conduct, or prosecutorial or defense misconduct; (2) the existence of viable alternatives to a mistrial; (3) the extent of any prejudice to a defendant by a second trial; (4) whether a second trial accords with the ends of public justice and judicial administration; and (5) any other relevant factors unique to the case. Applying this framework to the facts of this case, we see no abuse of discretion.

(i)

The circumstances that created the situation

The ongoing COVID-19 pandemic is a grave, unprecedented, and unpredictable public health crisis which has prompted stay-at-home orders, business closures, and ever-changing operational restrictions. Neither the judge nor the parties here could have predicted the restrictions on the judiciary that would become necessary as a result of the pandemic, and even today it remains unclear when jury trials may be able to return to the status quo.

Accordingly, the judge noted "[t]his situation certainly was not created by any prosecutorial misconduct, as the State has been ready and waiting to resume from the very day months ago when it was permitted." Furthermore, "[t]he initial suspension of trial in March [2020] due to the pandemic was beyond the control of all parties and resulted in an arguably untenable delay, threatening the fairness of the trial, even at the time [our] Supreme Court allowed the resumption of suspended trials in June [2020]." The judge properly did not find fault in defendants' refusal to consent to the resumption of the trial in June 2020, particularly given defendants' and defense counsels' high-risk status for complications from COVID-19. Defense counsel acted in good faith in expressing their concerns for the health of themselves, defendants, and those participating in the trial. Thus, the circumstances creating the predicament were beyond the control of all involved and were not the result of prosecutorial or defense misconduct.

(ii)

The existence of viable alternatives

Unlike State v. Georges, 345 N.J. Super. 538 (App. Div. 2001), and State v. Love, 282 N.J. Super. 590 (App. Div. 1995), there was simply no viable or less drastic alternative to declaring a mistrial. And contrary to defendants' argument, the judge properly considered the alternatives proposed

by the parties. Defense counsel proposed that the trial remain suspended until it could resume under the pre-pandemic conditions. But that could be many more months in addition to the seven that had elapsed.[15] As Judge Edwin H. Stern noted, "a delay during any trial of four months is inexcusable and affects the fact finder's recollection and assessment of credibility." State v. Leonard, 234 N.J. Super. 183, 190, n.4 (App. Div. 1989); see United States v. Chapman, 524 F.3d 1073, 1083 (9th Cir. 2008) (explaining that a trial judge's determination that a jury's attention span could not withstand a delay of between two and four weeks was due substantial deference in determining appropriateness of a mistrial). Here, the judge patiently waited seven months before raising the subject of declaring a mistrial, which at that point had no reasonable prospects of resuming in the near future.

---

[15] On September 16, 2020, Dr. Anthony Fauci, Director of the National Institute of Allergy and Infectious Diseases and one of the lead members of the White House Coronavirus Task Force, estimated that the country would return to a "reasonable form of normality" by the end of 2021. See Betsy McKay, Dr. Fauci Says 'There Will Be an End' to Covid-19, Wall Street Journal (Sept. 16, 2020, 10:24 PM), https://www.wsj.com/articles/fauci-says-there-will-be-an-end-to-covid-19-11600309449. Recently, Dr. Fauci has suggested that, assuming the United States achieves a vaccination rate of seventy-five percent to eighty percent, we may see "some degree of normality that is close to where we were before" at the end of 2021. See Alvin Powell, Fauci Says Herd Immunity Possible by Fall, 'Normality' by End of 2021, Harv. Gazette (Dec. 10, 2020) https://news.harvard.edu/gazette/story/2020/12/anthony-fauci-offers-a-timeline-for-ending-covid-19-pandemic/.

Although polling the jury would have created a more complete record about terminating the trial, the judge correctly found that doing so was not a viable alternative. Polling the jury in October 2020 would not have answered the question of whether the jurors could continue to serve for an indefinite period of time and whether they could have been able to recall the evidence at some unknown point in the future when the trial eventually resumed. Under the unique and extraordinary circumstances of this case, there were simply no alternatives to a mistrial.

As we previously explained, a trial judge's discretion is exercised improperly "if the [trial judge] has an appropriate alternative course of action." Allah, 170 N.J. at 281. "[A] curative instruction, a short adjournment or continuance, or some other [such] remedy, may provide a viable alternative to a mistrial, depending on the facts of the case." Smith, 224 N.J. at 47; see State v. Gallegan, 117 N.J. 345, 353 (1989) (noting that under appropriate circumstances, an adjournment is one of "the alternatives given to [trial judges] in order to avoid the unnecessary termination of proceedings").

For example, in State v. Modell, 260 N.J. Super. 227, 232 (App. Div. 1992), defense counsel expressed concern as he began to present his case that the alleged victim, who had appeared on behalf of the State, would fail to appear for defendant's case with certain records even though the defense had

30

served him with two subpoenas.  The trial judge considered the alternative of striking the testimony of the witness, which would have necessitated dismissal of four counts of the indictment, but instead declared a mistrial based on "manifest necessity."  Ibid.  We were "convinced that the declaration of a mistrial by the [trial judge] served the ends of public justice while at the same time . . . protected the defendant's rights."  Id. at 245.

In Georges, 345 N.J. Super. at 545-47, we determined there existed no manifest necessity for a sua sponte mistrial where two jurors were excused because their parents had died during the trial and the prosecutor went on a scheduled vacation, causing a two-week delay.  The trial judge, over defendant's objection, had declared the mistrial a manifest necessity because the delay of two weeks between the close of evidence and resumption of the trial was "simply too great to permit the jury to fairly remember and evaluate the testimony[.]"  Id. at 541.  We reversed, concluding "there was no particular urgency that necessitated the trial judge's sua sponte declaration of a mistrial before hearing the arguments of all counsel and examining alternatives to a mistrial," including "question[ing] the jurors to determine their comfort level with proceeding, and explain[ing] the availability of read-back testimony, before determining whether the time lapse was fatal to a fair trial."  Id. at 547.

31

And in <u>Love</u>, 282 N.J. Super. at 593, the trial judge sua sponte declared a mistrial upon learning of his mother-in-law's unexpected death. We concluded that the trial judge should have considered "[a]ny reasonable alternative" before declaring the mistrial without defendant's express consent, but was nonetheless satisfied that the sua sponte declaration of mistrial did not preclude the retrial because it was not "designed to help the prosecution or aid the State's cause or for any reason based upon the conduct of the trial or proceedings." <u>Id.</u> at 598. However, the federal court subsequently granted the defendant's petition for a writ of habeas corpus and held that "[t]he availability of several adequate, less drastic alternatives," including adjourning the trial or continuing the trial with a different judge, negated a finding of manifest necessity and compelled the federal court "to conclude that petitioner's retrial following a mistrial violated the Double Jeopardy Clause of the United States Constitution." <u>Love v. Morton</u>, 944 F. Supp. 379, 389-91 (D.N.J. 1996), <u>aff'd</u>, 112 F.3d 131, 139 (3d Cir. 1997).

Here, viable alternatives such as the ones present in the cases discussed above were not readily available, as a further continuance or adjournment for an indefinite period was not feasible given the state of the pandemic. As discussed previously, the judge and counsel conferenced about ways in which the trial could proceed under our Supreme Court's Omnibus Orders. The judge

and counsel contemplated moving to a larger courtroom that would be more conducive to social distancing, as well as utilizing plexiglass barriers and personal protective equipment such as masks and face shields, but defense counsel rejected these suggestions, citing concerns that it could impact the presentation of their case. The judge and counsel also discussed the possible need to voir dire the jury prior to resuming the trial and their potential inability to recall testimony from twenty-nine witnesses from months earlier. The judge considered the possibility of playing back the testimony to the jury but expressed concern that playback "months removed from when the jury first heard the testimony, with the witnesses, in person," would be insufficient considering the circumstances. The judge was left with no viable alternatives to proceed with the case.

(iii)

The extent of any prejudice to a defendant by a second trial

There is no indication on this record that defendants will be prejudiced by a second trial. Defendants contend that there was no prejudice in allowing the matter to remain suspended until the trial could safely resume at some indefinite point in the future, but they contend that they will suffer prejudice if they are retried. Smith argues that she will be prejudiced because she will be unable to retain her counsel for a second trial, presumably referring to the

lawyer who is ninety-seven-years old. But Smith retained co-counsel, from the same law firm, and there is no suggestion that he is unable to represent Smith in the second trial.

Additionally, defendants argue that they will be prejudiced by the mistrial because they will remain detained for an indeterminate period. They contend that "[t]here is no guidance on when a multi-defendant, three-month jury trial, will even be considered a candidate for trial during the pandemic." That is true. However, there is also no guidance on when their trial will be able to resume under the pre-pandemic "gold standard" standard defendants seek. The only quick solution to their continued incarceration would have been for defendants to consent to the resumption of their trial in June 2020. As the judge found, defendants had credible reasons for declining to do so. At this point, as the second wave of the pandemic rages on, defendants are facing a long period of incarceration regardless of whether they wait for the resumption of their trial or retrial. And as counsel explained during oral argument, defendants preferred remaining detained until the trial can be safely resumed.

Whether a second trial accords with the ends of
public justice and judicial administration

A second trial will accord with the ends of public justice and proper judicial administration. See Loyal, 164 N.J. at 437. The judge found—and we agree—there was "an urgent need to discontinue the trial . . . to safeguard the defendants from any prejudice stemming from the delay and to protect the ends of public justice, as the totality of the circumstances of the continued suspension have only eroded and will continue to erode the prospects of a fair and just result in this trial." We agree with defendant Cousins that the March 2020 suspension was consistent with the public interest in protecting the participants from COVID-19. Seven months later, a continued suspension of the trial to an indeterminate date in the future will violate "the right of society to have its trial processes applied fully and fairly in the due administration of the criminal law[.]" Farmer, 48 N.J. at 175. Furthermore, defendants will be better prepared for retrial because they now have the benefit of knowing the testimony from the witnesses who testified for the State.

(v)

Any other relevant factor under the unique facts the case

A mistrial has been justified based on "manifest necessity" where, as in this case, there was an unexpected indefinite or lengthy mid-trial delay that

would affect the jury's recollection and assessment of credibility. For example, in State v. Mendoza, 305 N.W.2d 166, 170 (Wis. Ct. App. 1981), the appellate court found that the trial judge's sua sponte declaration of a mistrial was justified under the "manifest necessity" standard where a juror was unavailable for an indefinite period due to illness. See United States v. Brandner, 90 F. Supp. 3d 883, 887-88 (D. Alaska 2015) (declaring a mistrial after defense counsel's unanticipated and serious illness resulted in a four-month delay in the midst of trial); Commonwealth v. Robson, 337 A.2d 573, 576-78 (Pa. 1975) (affirming the termination of trial based on "manifest necessity" where the trial judge's illness suspended—and prevented the continuation of—trial for several weeks).

Defendants argue that, like in Georges and Love, the judge rendered his mistrial declaration in haste. However, he allowed the suspension to endure for seven months, and only then did he conduct numerous status conferences, hear oral argument, and issue a comprehensive oral decision. At the time the judge declared the mistrial, the trial had been suspended as a result of the COVID-19 pandemic, with no end in sight.

As the judge found, even if the trial could have resumed in October 2020 and a sufficient number of the existing jurors were still available, he had "great concern" as to whether the jury would be able to consider the evidence fairly

after the lengthy delay. The jury would have to consider the testimony of the twenty-nine witnesses who testified in February and March 2020, and the testimony of any additional witnesses to be called by the State or the defense. That would be very difficult, even with the option of playback, because—as he found—playback "would occur many months removed from when the jurors actually had the opportunity to listen to the testimony, view the evidence and do that in conjunction with an assessment and evaluation of the demeanor of the witnesses." We will not second guess the judge's findings, especially since he presided over the commencement of the trial and was in the best position to fairly assess the situation that existed at the beginning of the case and thereafter.

This case is also distinguishable from Leonard, on which defendant Cousins relies. In that case the defendant was tried in municipal court on a driving while under the influence charge. Leonard, 234 N.J. Super. at 184. On the first day of trial, the State presented the testimony of its primary witness, a former municipal police officer, who had responded to the scene of the accident. Id. at 185. The trial judge adjourned the trial at the conclusion of the witness's direct and cross-examination testimony, subject to recall by the State for continued testimony. Ibid. The witness did not appear when the trial resumed four months later, and the trial judge discovered that a transcript of

37

the witness's testimony could not be prepared due to a tape malfunction.  Ibid.

The trial judge sua sponte declared a mistrial over the defendant's counsel's

objections because four months had passed since the hearing date.  Ibid.  We

concluded that under those circumstances, the defendant was entitled "to have

the [trial] judge decide his guilt or innocence without giving the State the

opportunity to start anew."  Id. at 190-91.  We held that under the "totality of

facts," including the missing transcript and absent witness, that "defendant

could not be retried as a result of the trial judge's inappropriate exercise of

discretion."  Id. at 191-92.

In Leonard we explained that although there was a deficiency in the

record, the Law Division could have either supplemented the record on appeal

or conducted a plenary trial.  Id. at 190-91.  Here, rather than being prompted

by a deficiency in the record, the declaration of the mistrial was justified by

the unique circumstances of this case coupled with the pandemic.  Moreover,

although the we did not consider the length of the delay in making our

determination, we noted that "a delay during any trial of four months is

inexcusable and affects the fact finder's recollection and assessment of

credibility."  Id. at 190 n.4.  Certainly here, as the judge found, the entirely

unexpected seven-month delay caused by the COVID-19 pandemic created a

"manifest necessity" for the declaration of a mistrial because it affected the

juror's ability to recall the testimony of the twenty-nine witnesses who had testified.

We reject defendants' additional argument that the trial judge was without authority to declare a mistrial.  Our Court set forth a plan "to limit physical interactions in our courts to the greatest extent possible and shift to use video and phone conferencing options for attorneys, litigants, and the public."  See Notice New Jersey Court Operations–COVID-19 Coronavirus: Rescheduling of In-Court Proceedings Scheduled for the Week Beginning Monday, March 16, 2020; Continuation of All Critical Functions 1 (March 15, 2020).  Thus, although jury trials were suspended, court operations, including motions, continued with or without consent, albeit virtually.  In fact, in this case, the judge conducted several status conferences.  Thereafter, by order issued on June 22, 2020, our Court authorized ongoing jury trials that had been suspended to resume "consistent with public health precautions with the consent of all parties[.]"  Fourth Omnibus Order 1.

Throughout this period, New Jersey courts have continued to sustain court operations to the greatest extent possible.  At no point did our Court order that all motions, including motions for a mistrial, were suspended and thus the judge's authority was not circumscribed.  In fact, in its latest order dated November 16, 2020, our Court suspended in-person jury trials, but not

all court operations, and specifically provided that judge's "in any individual matter consistent with Rule 1:1-2(a)" could "suspend proceedings, extend discovery or other deadlines, or otherwise accommodate the legitimate needs of parties, attorneys, and others in the interests of justice[.]" See November 16, 2020 Suspension 6. Thus, the judge had the authority to declare a mistrial in a case that had been suspended on March 17, 2020, and that had not resumed seven months later due to the pandemic.

To summarize, we conclude that the judge did not abuse his discretion by determining the extraordinarily unique circumstances of this case created a manifest necessity for a mistrial, and by holding "the ends of justice . . . cannot be achieved without aborting the trial[.]" Farmer, 48 N.J. at 171. An entirely "unexpected, untoward and undesigned incident or circumstance" arose in the form of the COVID-19 pandemic that did "not bespeak bad faith, inexcusable neglect or inadvertence or oppressive conduct on the part of the State, but which in the considered judgment of the trial [judge] create[d] an urgent need to discontinue the trial in order to safeguard the defendant against real or apparent prejudice[.]" Id. at 174. As in Farmer, there was no doubt that the judge's primary motive for declaring the mistrial was his sincere effort to protect defendants. Id. at 175. And that is exactly what the judge did here. Thus, double jeopardy would not be violated by a retrial because, under

N.J.S.A. 2C:1-9(d)(3), the termination was "required by a sufficient legal reason and a manifest or absolute or overriding necessity."

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION